Roger Thomas SCAGGS, Appellant,

v.

The STATE of Texas, Appellee.

No. 03–99–00081–CR.

Court of Appeals of Texas, Austin.

May 4, 2000.

Rehearing Overruled June 22, 2000.

Roy Q. Minton, Minton, Burton, Foster & Collins, P.C., Terrence W. Kirk, Law Office of Terrence W. Kirk, Austin, for Appellant.

C. Bryan Case, Jr., Assistant District Attorney, Austin, for the State.

Before Justices KIDD, YEAKEL and DALLY.*

CARL E. F. DALLY, Justice (Retired).

Appellant Roger Thomas Scaggs was convicted of the offense of murder. *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 1994). The jury assessed appellant's punishment at imprisonment for thirty-two years and a fine of $10,000. On appeal, appellant asserts that the trial court erred in failing to hold a hearing on his motion for new trial, in denying his motion for new trial, in denying his motion to suppress evidence, in admitting inadmissible evidence, and in permitting the State to withhold discoverable evidence. We will overrule appellant's points of error and affirm the judgment.

### Facts

In his brief appellant states, "Appellant does not challenge the sufficiency of the evidence in a legal sense. He does, however-er, maintain his innocence, despite the

---

* Before Carl E.F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment.

jury's verdict." We will give only a brief summary of the facts; pertinent facts are discussed with the points of error.

Appellant's wife, Penny Scaggs, was murdered in her West Austin home on March 6, 1996. She had been beaten to death with a pipe and then stabbed several times. The appellant, who was chief executive officer of an Austin company, claimed that he had dinner with her that evening then returned to work at 7:00 p.m. He said he then discovered her body upon returning home from work shortly after 9:00 p.m. He called his neighbor Diana Coleman and EMS. Appellant gave written consent for a search of his house and agreed to an interview with Sergeant David Carter. Several people who had contact with the appellant at the scene on the night of the murder, as well as others who observed him later, testified to appellant's apparent lack of grief over his wife's death.

After interviewing the appellant on the night of the murder, Sergeant David Carter realized he had to confirm or eliminate appellant as a suspect. Therefore, the next day Sergeant. Carter arranged to have the dumpsters behind the appellant's place of business picked up and searched. The search yielded discovery of a one and one-half inch galvanized pipe, a kitchen knife, several latex gloves, and some missing jewelry belonging to the victim. The evidence was taken to the DPS crime lab for blood and fingerprint analysis. It was determined that four fingerprints left in the talcum powder inside the latex gloves matched those of the appellant. DNA analysis showed that blood found on the knife, gloves, and pipe belonged to the victim. The blood analysis showed that the victim's blood was on the outside finger of one glove; the appellant's fingerprint was found on the inside of the same finger of the glove.

*See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

In addition to the physical evidence, the State offered evidence of motive by showing that the appellant was having an affair with one of his employees, Vanessa Ferguson. Evidence suggested that this affair began prior to the victim's murder and continued afterwards. The evidence showed appellant's wife was aware that something was amiss in their marriage, especially when her husband neglected to care for her during a serious illness about six months before her death.

### Necessity of Hearing on Motion for New Trial

■ In his first point of error, appellant asserts that the trial court erred in failing to hold a hearing on his motion for new trial. A new trial is the rehearing of a criminal action after the trial court has, on the defendant's motion, set aside a finding or verdict of guilt. *See* Tex.R.App. P. 21.1. A motion for new trial is a prerequisite to presenting a point of error on appeal only when necessary to adduce facts not in the record. *See id.* rule 21.2. Various grounds for granting a new trial are enumerated. *See id.* rule 21.3. However, the enumerated grounds are not exclusive. *See State v. Evans,* 843 S.W.2d 576, 578–79 (Tex.Crim.App.1992); *State v. Read,* 965 S.W.2d 74, 77 (Tex.App.—Austin 1998, no pet .). "The State may oppose in writing any reason the defendant sets forth in the motion for new trial." Tex.R.App. P. 21.5. In hearing the motion for new trial, the trial court may receive evidence by affidavit or otherwise. *See id.* rule 21.7. If they are offered and admitted in evidence, sworn motions and affidavits may serve as proof of allegations for a new trial. *See McIntire v. State,* 698 S.W.2d 652, 658 (Tex.Crim.App.1985). Motions for new trial and affidavits and controverting affidavits are mere pleadings unless offered and admitted in evidence. *See id.* at 658; *Stephenson v. State,* 494 S.W.2d 900, 909–10 (Tex.Crim.App.1973).

■ It has long been held that a trial court may decide a motion for new trial based on sworn pleadings and affidavits admitted in evidence *without* hearing oral testimony. *See McIntire,* 698 S.W.2d at 658; *Vallone v. State,* 141 Tex.Crim. 220, 147 S.W.2d 227, 230 (1941); *McBee v. State,* 119 Tex.Crim. 279, 44 S.W.2d 699, 701 (1931); *Asher v. State,* 102 Tex.Crim. 162, 277 S.W. 1099, 1104 (1924); *McConnell v. State,* 82 Tex.Crim. 634, 200 S.W. 842 (1918). *See also Stephenson v. State,* 571 S.W.2d 174, 176 (Tex.Crim.App.1978); *Bahlo v. State,* 707 S.W.2d 249, 251–52 (Tex.App.—Houston [1st Dist.] 1986, pet. ref'd); *Burke v. State,* 691 S.W.2d 836, 839 (Tex.App.—Fort Worth 1985, pet. ref'd).

■ "When an accused presents a motion for new trial raising matters not determinable from the record, upon which the accused could be entitled to relief, the trial judge abuses his discretion in failing to hold a hearing." *Reyes v. State,* 849 S.W.2d 812, 816 (Tex.Crim.App.1993). "[A] defendant need only assert reasonable grounds for relief which are not determinable from the record in order to be entitled to a hearing." *Jordan v. State,* 883 S.W.2d 664, 665 (Tex.Crim.App.1994). However, a trial court does not abuse its discretion in overruling a motion for new trial without a hearing unless the motion and supporting affidavits state facts that, if true, would entitle the defendant to a new trial. *See Hernandez v. State,* 952 S.W.2d 59, 74 (Tex.App.—Austin 1997), *remanded on other grounds,* 957 S.W.2d 851 (Tex.Crim. App.1998). When a trial court does not conduct a hearing on a motion for new trial, an appellate court must determine whether the motion and affidavits show reasonable grounds that would entitle a defendant to a hearing of the motion. *See Jordan,* 883 S.W.2d at 665; *Garcia v. State,* 960 S.W.2d 329, 333 (Tex.App.—Corpus Christi 1997, no pet.); *Sandoval v. State,* 929 S.W.2d 34, 36 (Tex.App.—Corpus Christi 1996, pet. ref'd).

### Procedural Facts

Appellant filed a motion for new trial and affidavits alleging that he was entitled

to a new trial because a "disabled" juror served on the jury. The State filed a responsive pleading and affidavits controverting appellant's allegations.

The trial court entered the following order:

### ORDER ON MOTION FOR NEW TRIAL

On this the 21st day of January, 1999, having considered the defendant's *Motion for New Trial,* the *State's Response to Motion for New Trial,* and the affidavits attached to each motion, which are hereby admitted into evidence, the Court finds that:

There is no legal necessity for an evidentiary hearing or argument of counsel on this motion for new trial.

There is no factual or legal basis warranting the granting of a new trial in this matter.

**THEREFORE, IT IS THE ORDER OF THIS COURT** that the defendant's request for a hearing on his *Motion for New Trial* is **DENIED** and that the defendant's *Motion for New Trial* is **DENIED**.

Signed and entered this the 21st day of January, 1999.

Appellant's motion for new trial and affidavits were timely filed. Although the record does not otherwise show that the motion and affidavits were presented to the trial court, the court's order denying the motion is sufficient to presume that the motion was presented to the trial court. *See Musgrove v. State,* 960 S.W.2d 74, 76 (Tex.Crim.App.1998). After the trial court rendered its order denying an evidentiary hearing and denying a new trial, appellant filed an objection and motion for reconsideration of the motion for new trial. Appellant's objection alleged that the trial court had wrongfully denied the motion for new trial without holding a hearing. The record does not show that the trial court ruled on the motion for reconsideration.

Appellant alleged in his motion for new trial that one of the jurors was "disabled" having "suffered brain damage at an early age." It was further alleged that the juror was "delusional, claiming for example, that she had served as a juror on the trial of Kenneth Allen McDuff," when, in fact, she had not. It was also alleged that the juror falsely stated on a jury questionnaire that she had served as a juror in three criminal cases and in one civil case. Appellant alleged that if he had been aware of this juror's mental condition at the time of voir dire he would have challenged her for cause. However, appellant alleged he did not learn of the juror's unfortunate condition until after the trial. Accompanying appellant's motion were the affidavits of appellant's investigator, the juror's physician, and an attorney.

Appellant's investigator Dennis Dement made an affidavit based on his telephone interview of the juror after trial. In his affidavit Dement stated that the juror told him she met Colleen Reed not very long before her death, and even though she knew Reed, she was selected and served as a juror in McDuff's trial for the murder of Reed. Dement also stated that the juror told him she had seizures and had been under the care of Dr. Douglas Hudson, a neurologist. The juror also told Dement that she decided that Scaggs was guilty one night in her sleep.

Dr. J. Douglas Hudson, a physician specializing in neurology, made an affidavit concerning the juror. Dr. Hudson related that this juror had been his patient since she was a young girl and that he had been told she served as a juror in the Scaggs' case. He stated, "Candidly I must admit that I was surprised to learn she was selected, given her impaired mental faculties." Dr. Hudson also stated:

[The juror] was born with limited mental abilities, and at approximately 6 years of age she suffered a bout of encephalitis, resulting in hydrocephalus. This was relieved by a shunt implanted in her head to allow fluid to drain off her brain.

Following the encephalitis she began suffering from frequent seizures, which persist. She therefore has organic brain damage that limits her ability to make intellectual decisions. On November 16, 1998, she reported that she had a seizure two days earlier on November 14. The seizures often affect her ability to perform intellectual functions for up to 24 hours, as well as impair her memory. I prescribed Dilantin and Tegretol, which she has been taking daily for many years. At times these medications may further aggravate her intellectual functioning.

It is my professional opinion, based upon my understanding of the responsibilities of a juror, that [the juror] was not mentally qualified to serve as a juror. She lacks the cognitive ability to critically analyze facts and make an independent decision based upon the evidence. In my opinion, she lacks sufficient mental capacity to reach an intelligent conclusion on such complex matters as those contained in the Court's Charge in this case.

Christopher Gunter, the defense attorney in McDuff's trial for the murder of Colleen Reed, stated in an affidavit that this juror did not serve on the jury that convicted McDuff.

### Qualifications of a Petit Juror

■ The Texas Constitution provides that the legislature shall prescribe by law the qualifications of petit jurors. *See* Tex. Const. art. XVI, § 19. All individuals are competent to serve as petit jurors unless disqualified. *See* Tex. Gov't Code Ann. § 62.101 (West 1998). One of the general qualifications of petit jurors is that they be of "sound mind." *See id.* § 62.102(4).

A juror is absolutely disqualified only when it appears that he or she is insane, under indictment or other legal accusation of theft or any felony, or has been convicted of theft or any felony. *See* Tex.Code Crim. Proc. Ann. arts. 35.19, 35.16(a)(2)(3)(4) (West 1989). Although not absolutely disqualified, a person who has a bodily or mental defect that would render them unfit for jury service may on voir dire be challenged for cause. *See id.* art. 35.16(5).

A conviction in a criminal case may not be reversed on appeal unless the appellant makes a showing that significant harm resulted from an *absolutely* disqualified juror having served and that the disqualification was not discovered or brought to the attention of the trial court until after the verdict was entered. *See id.* art. 44.46 (West Supp.2000).

The juror completed a sixteen-page juror's questionnaire and was interrogated by defense counsel on voir dire, but was unchallenged. Appellant does not claim that the juror was insane or *absolutely* disqualified. Appellant's contention is that the juror was "disabled" because of mental defect.

Assuming the truth of appellant's allegations relating to the "disabled" juror, he has not shown that the juror was absolutely disqualified or otherwise legally unqualified to serve as a juror. Therefore, the motion for new trial and affidavits fail to show reasonable grounds to require a hearing of appellant's motion for new trial. However, even if our assessment of the matter is wrong, an error in refusing appellant a hearing in the circumstances of this case would not require that the cause be remanded for a delayed hearing of the motion for new trial in the trial court. *See Green v. State*, 754 S.W.2d 687, 687–88 (Tex.Crim.App.1988) (holding when hearing on motion for new trial is improperly denied, remedy is to remand for delayed hearing on motion). The trial court stated in its order that appellant's motion for new trial, the State's controverting pleading, and the affidavits filed with these pleadings were admitted in evidence and considered by the court and that there was no need for an evidentiary hearing. If the trial court had convened a formal hearing on the motion, the court could have limited

the admission of evidence to the affidavits. If a formal hearing had been granted, appellant would not have been entitled to have the court take any other action than the court actually took. Appellant's first point of error is overruled.

█ We consider appellant's second point of error that the trial court erred in failing to grant his motion for new trial. The State's response to appellant's motion for new trial controverted appellant's allegations. The State's pleading alleged that the affidavits of eight other jurors attest to the fact that the juror in question was a conscientious individual who diligently performed her duties as a juror and understood the evidence and her duties as a juror. The State also alleges that appellant and defense counsel had the benefit of the juror's sixteen-page questionnaire for at least a week before trial commenced. The eight jurors in their affidavits described the juror whom appellant alleges was "disabled" as follows:

Juror number one:

Also on the jury panel was L__A__J__. What I remember mostly about L__A__J__ is that she was one of the four which voted not guilty at the start of our deliberations. The foreman requested each member to summarize the reasons for their vote. We each took a turn and went around the table. When it came to L__A__s turn, she gave her reasons for her not guilty vote. I cannot remember what exact reasons she gave. After everyone had their opportunity to express their view, L__A__ spoke up and said that she wanted to change her vote to guilty. The foreman had L__A__ explain why she wanted to change her vote. Even though I do not remember exactly what she said, I do remember that it was a reasonable explanation. It was obvious that L__A__ was extremely street smart. She had events going on throughout the trial with her family and work. It appeared to me that she was able to reason or work them out. I remember her speak-

ing up on a few issues and had fairly good recall. At the start of the trial, I would have to admit that I was a little concerned about her ability to take things in. By the time of deliberation my concern was not as great. L__A__ was a good juror in my opinion.

Juror number two:

I served on the jury panel for the State of Texas vs. Roger Scaggs. L__A__ was also a juror on this trial. I spent a little extra time with her, because I took her home on two different occasions. L__A__ never discussed her thoughts about the trial with me, either on the drive home or during recesses. L__A__ was sick most of the trial with some sort of allergy problems, but seemed alert and interested. She struck me as a person living somewhat out of the main stream, maybe a little bit odd, but certainly not unintelligible or inappropriate. L__A__ was one of the least vocal of the jurors.

Juror number three:

L__A__J__ was not stupid, but was a little different. L__A__J__ lives a life style controlled by the clock. She had a problem with things being done in a timely manner. L__A__ was a clock watcher. During deliberation she participated and had useful comments. It is my opinion that she knew what was going on and participated in the discussion helping all of us reach a just conclusion.

Juror number four:

L__A__J__ also served on the jury. During the days that the evidence was being presented I could tell that she was a little slower than the rest of us, but when she began deliberating I could see that she knew and understood the issues in the case. I could tell during trial that she was giving it her full attention and effort.

Juror number five:

L__A__J__ was a little different in that her social skills were lacking. In my

opinion L__A__ was a little slow, but was more than capable of making an intelligent decision. It appeared to me that she listened and participated in deliberations. L__A__ made her own decision and was able to justify why she made it.

Juror number six:

L__A__J__ was also a juror. I was somewhat surprised that she was selected, but throughout the testimony and deliberation my opinion changed and I felt that she was qualified. L__A__s life experiences were guarded and limited and might be why she appeared a little different. I felt that she could make decisions and that she contributed as a juror in helping reach the final verdict.

Juror number seven:

L__A__J__ was nice and did not talk as much as a few of the others. However, there were others who talked less than L__A__. She seemed to me as though she was with it during recesses, breaks and deliberations. The foreman had everyone go around the circle and express their opinion. The minority group had to try to explain why they thought Scaggs was innocent, so L__A__ had to express her reasons for believing that way. L__A__ later joined the majority. L__A__ made her own decision and seemed to feel comfortable in doing that. There was a strong emphasis on not putting pressure on anybody, so no one pressured L__A__ and L__A__ did not pressure anyone.

Juror number eight:

L__A__J__ was a fellow juror. I remember at the beginning of the trial she informed us that she had a seizure disorder. All of us were concerned and I asked her what we should do if she had a seizure. She told us and we went on from there. I am a Special Education teacher. Through observing and listening to L__A__ it seemed that her expressive language skills suggested a lower than average IQ. However, she seemed capable of understanding what

we were expected to do. L__A__ participated in the deliberation and she had her own feelings and perceptions. She wasn't afraid to give us her opinion.

The juror in question made an affidavit. It was attached to the State's pleading. It reads as follows:

My name is L__A__J__, and I served on the jury in the Roger Scaggs case. I read in the newspaper last week some things that my doctor said about me. Dr. Hudson has been my doctor since I was young. I know that I had encephalitis when I was a child, but Dr. Hudson has never said anything to me about being brain damaged from it. I was surprised that he made those statements that were printed in the paper, and I called him today and told his nurse that I didn't appreciate him saying that.

I do have seizures but I was not affected by them during the Scaggs trial. I had a seizure on the Saturday night after we found him guilty.... The seizure that I had that night was not a hard one. I got over it by sleeping it off after it was over. That is how I normally get over them. It did not have any effect on me when I returned Monday for the punishment part of the trial. I did have bronchitis that made me feel a little sick during the trial, but I was able to pay attention and I was able to talk about the case with the other jurors at the end.

I still remember the evidence at trial, such as Roger calling Diana Coleman and then EMS; about Diana and her neighbor coming over; about Roger going to the police station and giving a videotape statement to the officer who had the idea to look in the dumpster; about the gloves, pipe, knife and jewelry found in the bag; about Roger's fingerprints and Penny's blood being on the gloves; and about the funeral service and burial, to mention a little bit.

Mr. Case asked me if I remembered what the court's charge was, and I told

him that it was what the judge read to us before we went out and selected a foreman. I was able to explain to him what the presumption of innocence was, why no one was supposed to talk about the defendant's failure to testify, and that the State must show that a defendant is guilty beyond a reasonable doubt or the jury must find him not guilty. Mr. Case asked me if a reasonable doubt was one based on reason and common sense, and I told him, yes, just like my doctor said I could not do.

I came to the District Attorney's Office last week to talk with the attorneys. Sally Hernandez picked me up at work. I spoke with Sally about the McDuff case. I had told some of the jurors that I served with that I had served on the jury in the McDuff case. I did meet a woman while I was in a class at the LCRA that I believe to be Colleen Reed, but I cannot swear that it was Colleen Reed. I paid attention to the McDuff case for this reason. I am not sure why I told some of the jurors that I served with that I was on the jury in the McDuff case, but I think it was because I wanted to show them that I could do it. I did not serve on the McDuff case, and I knew it when I said it, and I would like to apologize to Roger Scaggs' attorneys and to the jurors that I told this to. I work at Texas Department of Mental Health and Mental Retardation in Medicaid Administration as a Clerk I, and have been working there for about 7 years. I have a desk which has a computer which I use to do data entry for certified mail, in addition to some memos, routing slips, and e-mail. I also do other general office jobs, like sorting mail and keeping paper in the copiers and fax machines, delivering messages and escorting visitors.

■ Although based on conflicting evidence, a trial court's determination on voir dire that a prospective juror is or is not absolutely disqualified is a question of fact, and the court's ruling will not be disturbed on appeal except for an abuse of discretion. See Tex.Code Crim. Proc. Ann. art. 35.21 (West 1989); Chambers v. State, 903 S.W.2d 21, 27 (Tex.Crim.App.1995); Hammond v. State, 799 S.W.2d 741, 744–45 (Tex.Crim.App.1990); Wartley v. State, 978 S.W.2d 672, 674 (Tex.App.—Houston [14th Dist.] 1998, no pet.); Loughry v. State, 926 S.W.2d 382, 384–85 (Tex.App.—Fort Worth 1996, pet. ref'd). Certainly as stringent a rule as applied on voir dire should be applied after the verdict on a motion for new trial. The trial court denied appellant's motion for new trial; by doing so the trial court found the juror about whom appellant complained to be a qualified juror.

■ A decision to grant or deny a motion for new trial lies within the discretion of the trial court, and such decisions are reviewed under an abuse of discretion standard. See Rent v. State, 982 S.W.2d 382, 384 (Tex.Crim.App.1998); Hill v. State, 480 S.W.2d 670, 673 (Tex.Crim.App. 1972); Jordan v. State, 154 Tex.Crim. 217, 226 S.W.2d 449, 452 (1949); Vallone v. State, 141 Tex.Crim. 220, 147 S.W.2d 227, 230 (1940). Jordan v. State, 154 Tex.Crim. 217, 226 S.W.2d 449 (1949), was a case similar to this case. There a defendant filed a motion for new trial alleging that one of the jurors at the time of trial and during trial was insane and therefore not a qualified juror. See Jordan, 226 S.W.2d at 452. The State controverted the defendant's allegations with affidavits of the eleven other jurors. See id. The defendant offered evidence from "doctors, psychiatrists, and laymen" which he urged was so overwhelming that the trial court abused its discretion in denying the motion for new trial. See id. The Court of Criminal Appeals held that the trial court did not abuse its discretion in deciding the fact issues adversely to the defendant and did not err in denying the motion for new trial. See id.

We hold that the trial court did not abuse its discretion in denying appellant's

motion for new trial. Appellant's second point of error is overruled.

### Motion to Suppress

In his third point of error, appellant complains that the "trial court erred in denying appellant's motion to suppress evidence illegally seized from his home." Appellant alleges that police officers unlawfully seized and took from his home a butcher block and a photograph of the victim. Evidence was admitted to show that a knife allegedly used to attack the victim was the knife missing from the butcher block. The photograph seized was used to identify the victim's jewelry found in the dumpster.

Appellant, who was not under arrest or in custody, "having been informed of his constitutional right not to have a search made," gave police officers written consent to "conduct a complete search" of his home and authorized the officers "to take any papers, materials or any other property which they may desire, upon giving receipt for the same." This consent form was signed by appellant at 10:05 p.m. on March 6, 1996, soon after the discovery of his wife's body. Officers were in the home until the early morning hours on March 7. The house was then "sealed" for the continuing investigation. The officers returned to the house later on March 7 and again on March 8. On that day, in the presence of police officers, appellant and his daughter came to the house to obtained clothing. The investigation at the house was completed and it was "unsealed" and returned to appellant on March 9. Appellant was not arrested nor taken into custody until March 15. The officers told appellant from time to time what property had been seized, but ignored his request for a receipt for the property seized, to be used "for insurance purposes."

At the conclusion of the suppression hearing, the trial court made a written order:

### ORDER ON DEFENDANT'S MOTION TO SUPPRESS

On this the 24th day of October, 1998, having concluded the evidentiary hearing on the defendant's Motion to Suppress Evidence the Court finds that:

1) The Defendant Roger Skaggs [sic] freely and voluntarily consented to the search of his residence at 1908 Winter Park Road, Austin, Texas, on March 6, 1996, both verbally and in writing.

2) The defendant did not withdraw his consent to search his residence and the searches conducted on March 7th and 8th.

3) The searches of March 7th and 8th were not an expansion of the original search but a valid continuation and therefore did not exceed the scope of his consent.

IT IS THEREFORE the ruling of this Court that the Motion to Suppress evidence removed from the residence of Roger Skaggs [sic] is DENIED.

Appellant's specific complaints are that (1) the officer's failure to give him a receipt for the property seized rendered his consent involuntary, and (2) by going into his house on March 7 and 8 the officers exceeded the scope of appellant's consent. Appellant acknowledges that his first complaint "appears to be an issue of first impression in Texas." Appellant cites three cases, which he believes "points the way to a proper resolution of the issue." He cites *May v. State*, 582 S.W.2d 848 (Tex.Crim.App.1979) (consent to search van for tools did not authorize opening someone else's lunch box that was in the van); *Barber v. State*, 611 S.W.2d 67, 68 (Tex.Crim.App.1981) (consent to search front of automobile was not consent to search trunk); *Gilmore v. State*, 666 S.W.2d 136, 149 (Tex.App.—Amarillo 1983, pet. ref'd) (authorization to "secure" property in hotel room allowed police to pack defendant's property, but did not authorize a full investigatory search). We do not

find these cases persuasive in deciding the issue presented. We find a somewhat closer analogy to instances where officers fail to prepare a written inventory after executing a search warrant. The law provides that before an officer executing a search warrant takes seized property he shall prepare a written inventory of the property seized. *See* Tex.Code Crim. Proc. Ann. art. 18.06(b) (West Supp.2000). However, it has been held that the failure of officers to make a return on a search warrant or to deliver the accused an itemized list of the property seized in the absence of showing injury reveals no error and will not necessitate reversal of a judgment. *See Phenix v. State,* 488 S.W.2d 759, 766 (Tex.Crim.App.1973); *Daltwas v. State,* 375 S.W.2d 732, 734 (Tex.Crim.App. 1964). We do not agree with appellant that appellant's consent was in the nature of a contract. The failure of the officers to give appellant a written receipt for the property seized did not render appellant's consent for the search involuntary.

█ In this same point of error, appellant also claims that the officer's continued search of the house on March 7 and 8 exceeded the scope of his consent to the search. When appellant gave his written consent to the search of his home he was not under arrest or in custody. Appellant's consent to search could have been withdrawn at any time, but it was not. Appellant's written consent was not limited in scope or time; it authorized a "complete search."

Appellant cites two cases in support of his argument that the officers search on March 7 and 8 exceeded the search to which appellant consented. The cases are *Sanchez v. State,* 982 S.W.2d 929 (Tex. App.—Austin 1998, no pet.), and *State v. Brochu,* 237 A.2d 418 (Me.1967). In *Sanchez,* this Court held that the defendant's consent to search did not "carry over" to the second search because Sanchez was in jail and was "not given the opportunity to revoke his previous consent." *Sanchez,* 982 S.W.2d at 930. In addition, Sanchez

had refused to sign a written consent form and only allowed the officer to search the first time in his presence. *See id.* In *Brochu,* the defendant consented to a search of his home; at that time, the police did not know whether his wife's death was an accident or murder. *See Brochu,* 237 A.2d at 420. The next day, however, after the defendant was arrested, the police conducted a second search. *See id.* at 421. The court rejected the contention that initial consent to search remained valid until revoked, and noted that continuing consent would be inappropriate where the defendant had ceased to be a cooperating husband and became the accused. *See id.* The facts in *Sanchez* and *Brochu* are quite distinguishable from those in this case.

In *State v. Grega,* 168 Vt. 363, 721 A.2d 445 (1998), in a trial for the murder of his wife, Grega relied on "*Brochu* for the proposition that his consent [to search a condominium where his wife's body was found] expired once he became a suspect in his wife's death." *Grega,* 721 A.2d at 453. The Vermont Supreme Court rejected Grega's reliance on *Brochu* and pointed out that Grega was neither arrested nor charged when he gave his consent for the search of the condominium, and Grega did not withdraw his consent before being placed in custody. The court "conclude[d] that under these circumstances the police did not exceed the scope of the defendant's consent by continuing their search on two subsequent days." *Id.*

*State v. Fredette,* 411 A.2d 65 (Me.1979), decided after *Brochu* by the same court, was an appeal from an order denying in part and granting in part appellant's motion to suppress evidence. *See Fredette,* 411 A.2d at 66–70. The facts in *Fredette* are more like those in this case than were the facts in *Brochu.* On May 26, 1978, officers entered Ferdette's home with her consent to investigate the shooting of her husband. *See id.* Ferdette accompanied her husband when he was taken to the hospital. *See id.* The officers informed Ferdette of their desire to protect any

evidence on the premises and Ferdette did not object. *See id.* The officers secured and searched the house. *See id.* The officers maintained control of the house until May 29. *See id.* During the time the officers were in control of the house, Ferdette on at least two occasions re-entered the house to obtain clothing for herself and her children. *See id.* When she re-entered the house an officer accompanied her and inventoried the items she removed. *See id.* Ferdette at no time indicated that she wanted the officers to discontinue their search. *See id.* The Maine Supreme Court vacated the portion of the trial court's order suppressing evidence and affirmed that portion of the trial court's order denying suppression of evidence. *See id.*

In *Phillips v. State*, 625 P.2d 816, 816–18 (Alaska 1980), the defendant moved the trial court to suppress evidence, including a knife, obtained in a cabin where Mike Yakasoft and appellant lived and where the victim's body was found. *See,* 625 P.2d at 816–17. The Alaska Supreme Court held that the Yakasoft's initial consent for the search, which was not withdrawn, "extended to the subsequent entries and the investigators' thorough and probing search." *Id.* at 818. The court affirmed the trial court's denial of Phillips' motion to suppress. *See id.*

In this case, appellant was not in custody and was in frequent contact with the police officers during the time they were in control of his house, and during this time appellant assured the officers of his complete cooperation. He did not, although he had the opportunity to do so, withdraw his consent to a "complete search" of his house or the taking of any of his property. The record fully supports the trial court's finding that appellant voluntarily consented to the search and that the search did not exceed the scope of appellant's consent. Based on the totality of the circumstances presented by the record, we independently find that appellant voluntarily consented to the search and that the search did not exceed the scope of appellant's consent. The trial court did not abuse its discretion and did not err in denying appellant's motion to suppress. Appellant's third point of error is overruled.

### Evidence of Efforts to Locate Witness

██ In his fourth point of error, appellant contends that the "trial court erred in admitting evidence about the State's efforts to locate a missing witness." Both before and after his wife was murdered, appellant was having an affair with Vanessa Ferguson. Before trial, both appellant and the State applied for subpoenas for Ferguson. Ferguson, who had been absent from Austin for about six months, could not be found and the subpoenas were unserved. The State obtained an attachment requiring a $200,000 bond, but she could not be found and the attachment was not executed.

Prior to trial, appellant filed a motion *in limine* alleging that, although Ferguson "may serve as a material witness in support of Defendant's defense theory," Ferguson had not been served with subpoena nor attached; therefore, appellant asked the court to order the State not to comment, argue, or refer in any manner, to the absence of Ferguson. Appellant alleged that to allow evidence that Ferguson was unavailable would imply that appellant was responsible for her disappearance. The court ordered the State not to comment, argue, or refer to the unavailability of Ferguson without the permission of the court.

During trial the State refused to accept appellant's offer to stipulate that Ferguson was unavailable to either appellant or the State. The court overruled appellant's objections and granted the State's request to offer evidence showing the efforts made to obtain Ferguson's testimony. Evidence offered by the State and admitted by the court showed that the State had made exhaustive but unsuccessful efforts to locate Ferguson; it also showed that appel-

lant had obtained a subpoena for Ferguson.

Ferguson appeared after trial and pursuant to Ferguson's motion the court ordered that the writ of attachment previously issued be vacated as moot. Ferguson then executed an affidavit that was attached to and incorporated in appellant's motion for new trial. In her affidavit, Ferguson stated that she left the state before trial of her own volition. She acknowledged her affair with appellant, and she stated that she initiated the affair; she also made a conclusory statement that her testimony would have been favorable to appellant and would have supported his defense.

Supported by his trial objection, appellant argues on appeal that the admission of the complained of evidence was erroneous because it had no relevance, but if relevant its probative value was substantially outweighed by the danger of unfair prejudice to his defense. In his brief appellant states, "[T]here appear to be no cases directly on point."

The rules of evidence control. All relevant evidence is admissible except as otherwise provided by law. *See* Tex.R. Evid. 402. Relevant evidence is evidence having a tendency to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence. *See id.* rule 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See id.* rule 403. *See also Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App.1990).

Appellant has consistently argued that showing the unavailability of Ferguson as a witness would allow the jury to infer that appellant was responsible for her absence and that it would be detrimental to his defense. On the other hand, the State argues that the burden of proof on the State required the State to account for Ferguson's absence because she was a material witness, and that without accounting

for the absence of a material witness, a benefit would unfairly inure to appellant.

Ferguson and appellant were having an ongoing affair near the time of the murder. Appellant admitted to investigating officers that he had been with Ferguson on the night his wife was murdered. Because of these facts the officers felt it was necessary to eliminate Ferguson as a suspect in the murder. Ferguson's testimony could reasonably have been expected to have some bearing on appellant's guilt or innocence. The trial court found that Ferguson was a material witness, and that finding is supported by the record.

■ We hold that the trial court did not err in admitting evidence of the efforts to locate Ferguson. However, assuming this evidence was improperly admitted, its admission was harmless error. Appellant does not claim the admission of the complained of evidence was constitutional error; he claims only a violation of the rules of evidence. Other than constitutional error, error that does not affect substantial rights of a defendant must be disregarded. *See* Tex.R.App. P. 44.2(b). "A criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997); *Merritt v. State*, 982 S.W.2d 634, 636–37 (Tex.App.—Houston [1st Dist.] 1998, pet. ref'd); *Fowler v. State*, 958 S.W.2d 853, 864–65 (Tex.App.—Waco 1997), *aff'd*, 991 S.W.2d 258, 259–60 (Tex.Crim.App.1999).

Considering the entire record, we find that the admission of evidence relating to the efforts to obtain Ferguson's testimony was not error, but if error, it was harmless error. Appellant's fourth point of error is overruled.

## Testimony of Fox and Adams

■■■■ In his fifth point of error, appellant asserts that the "trial court erred in admitting evidence under Article 38.36 without compelling the State to meet the requirements of Rules 404(b) and 403 of the Texas Rules of Evidence." Appellant complains that the trial court erroneously admitted testimony of Sharon Fox and Pattie Adams. Fox was the victim's sister, and Adams was an employee of the company of which appellant was president. The testimony of both Fox and Adams included testimony about appellant's failure to care for his wife during an illness for which she had been hospitalized approximately six months before she was murdered. Appellant did not object when these witnesses testified. Preservation of error requires timely, specific objections. *See* Tex.R. Evid. 103(a)(1); Tex.R.App. P. 33.1. To preserve error for appellate review, counsel must object every time allegedly inadmissible testimony is offered. *See Hudson v. State,* 675 S.W.2d 507, 511 (Tex.Crim. App.1984); *Thomas v. State,* 916 S.W.2d 578, 580 (Tex.App.—San Antonio 1996, no pet.); *Hernandez v. State,* 914 S.W.2d 226, 233 (Tex.App.—Waco 1996, no pet.); *Thacker v. State,* 889 S.W.2d 380, 392 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd); *Soliz v. State,* 794 S.W.2d 110, 113 (Tex.App.—Houston [1st Dist.] 1990, pet. ref'd).

Appellant contends that his objection made when Mary Lowery testified was sufficient to preserve error when Fox and Adams later testified. When the State was attempting to elicit from Lowery testimony of the same nature as that later elicited from Fox and Adams the trial court held a hearing out of the presence of the jury to determine the admissibility of Lowery's testimony. The State urged, among other reasons, that Lowery's testimony was admissible under the provisions of Article 38.36(a) of the Code of Criminal Procedure, which provides:

## Evidence in Prosecutions for Murder

(a) In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Tex.Code Crim. Proc. Ann. art. 38.36(a) (West Supp.2000).

Following Lowery's examination out of the presence of the jury the record shows:

MS. LOWERY: What can I say and what can't I say?

THE COURT: And the record will reflect that the defense obviously objects to all of this.

[Defense Counsel]: Yes, sir.

THE COURT: And objects with—persistently and continually objects.

[Defense Counsel]: Object that it does not meet the requirements of 404(b), that 38.36 does not provide any authority to permit it in, and that it does not meet the requirements of 803(3). And on that basis we object. Thank you, Your Honor.

THE COURT: Sure. The Court will overrule the objection, and the record will reflect the exception to the Court's ruling.

[Defense Counsel]: Yes, and I think that I made this clear earlier and you made it saying 38.36 does not extend the rules of evidence.

THE COURT: That's correct.

The trial court without determining that Lowery's testimony was admissible under Rules of Evidence 404(b) and 403, ruled that Lowery's testimony which was heard out of the presence of the jury would be admitted. In a case decided after the trial of this case the Court of Criminal Appeals held:

Because Article 38.36(a) and Rules 404(b) and 403 can be congruously applied as mandated by Rule 101(c), and because grafting an exception into Article 38.36(a) contravenes its plain language, this Court holds evidence admissible under Article 38.36(a) may be nevertheless excluded under Rule 404(b) or Rule 403. Consequently, if a defendant makes timely 404(b) or 403 objections, before a trial court can properly admit the evidence under Article 38.36(a), it must first find the non-character conformity purpose for which it is proffered is relevant to a material issue. If relevant to a material issue, the trial court must then determine whether the evidence should nevertheless be excluded because its probative value is substantially outweighed by the factors in Rule 403.

*Smith v. State,* 5 S.W.3d 673, 679 (Tex. Crim.App.1999).

Although the trial court's ruling that Lowery's testimony was admissible was favorable to the State, the State did not offer before the jury Lowery's testimony to which appellant had objected. As appellant concedes on appeal, the "issue became moot when the State declined to question Lowery further about Penny's illness." After Lowery testified, fourteen other witnesses testified before Fox and Adams testified. Appellant insists that the trial court's comment "persistently and continuously objects" relating to Lowery's testimony carried over and made it unnecessary to object to the testimony of Fox and Adams.

 The Court of Criminal Appeals has recognized two exceptions to the contemporaneous objection rule. One exception is the "running objection." The other related exception is provided by the rules of evidence. "When the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the

necessity of repeating those objections." Tex.R. Evid. 103(a)(1); *see Ethington v. State,* 819 S.W.2d 854, 858–59 (Tex.Crim. App.1991). In this case, appellant did not ask for a running objection nor did he ask for the application of Rule 103(a)(1). However, even if the trial court's volunteered comment "persistently and continually objects" can be adopted by appellant and construed as a running objection or the application of Rule 103(a)(1), that ruling would only apply to Lowery's expected testimony before the jury and not to the later testimony of Fox and Adams. A running objection when requested by defense counsel and granted by the trial court does not preserve error when another witness testifies to the same matter without objection. *See Sattiewhite v. State,* 786 S.W.2d 271, 283 n. 4 (Tex.Crim. App.1989); *Goodman v. State,* 701 S.W.2d 850, 863 (Tex.Crim.App.1985); *White v. State,* 784 S.W.2d 453, 458–61 (Tex.App.— Tyler 1989, pet. ref'd).

In *Goodman,* a running objection was granted to the testimony of one witness. *See Goodman,* 701 S.W.2d at 863. The court held that the running objection did not carry over or preserve error when, after seven more witnesses testified, the same matter was admitted without a renewal of the objection. *See id.* In *White,* a running or continuing "hearsay objection" was overruled when one witness testified. *See White,* 784 S.W.2d at 458–61. Five other witnesses testified without objection to the same hearsay matter. *See id.* The appellate court held that the earlier objection did not preserve for appellate review the alleged error relating to the testimony of the other five witnesses. *See id.* Further, allowing the unobjected hearsay testimony of the five witnesses waived the objection as to the testimony of the first witness. *See id.*

This case is unlike that of *Ford v. State,* 919 S.W.2d 107, 113 (Tex.Crim.App.1996). In *Ford,* when "the decedent's mother was called to testify, appellant stated 'Your Honor, I would ask that my running

objection extend to all witnesses, if they testify to the same type of matter.' The trial court responded, 'All right, I note your objection. I'll grant your running objection on this issue and overrule it.'" *Ford*, 919 S.W.2d at 113. On appeal, the *Ford* court held "the record reflects that appellant was clearly objecting 'to any and all impact evidence' as 'to all witnesses testifying to such. The trial court clearly understood such complaint and ruled adversely thereon. We conclude that appellant has preserved his claim for review.'" *Ford*, 919 S.W.2d at 113–14; *see also George v. State*, 959 S.W.2d 378, 383–84 (Tex.App.—Beaumont 1998, pet. ref'd).

Appellant did not ask for his objection to apply to the testimony of other witnesses. The court's ruling made fourteen witnesses before Fox and Adams testified did not apply to their testimony. We conclude that appellant's failure to object to the testimony of Fox and Adams resulted in failure to preserve for appellate review the alleged error. Appellant's fifth point of error is overruled.

### DNA Evidence

■ In his sixth point of error, appellant urges that the "trial court erred in permitting the State to withhold evidence that DNA evidence in the case might have been contaminated." There is no contention that all of the DNA material in the case was contaminated; only the samples analyzed by DPS were contaminated while being analyzed.

Appellant's pretrial discovery motion included a request that the State disclose the name, address, "and the substance of the opinion which the expert witness was expected to offer." The State agreed to comply with appellant's request except the State would not furnish the defense with a list of rebuttal witnesses and would not be responsible for making copies of every document related to the DNA testing. Accordingly, with this agreement between the State and appellant, the trial court granted appellant's discovery motion.

During the course of trial preparation, the State disclosed to appellant's counsel that Department of Public Safety serologist Donna Stanley not only found appellant's and the victim's DNA in the samples analyzed, but also found unidentified DNA material under the victim's fingernails, on a hair found on a knife, and in blood found on the kitchen counter in the Scaggs' home. The State made unsuccessful efforts to identify the source of the unidentified matter, by obtaining DNA material from people who had been in the Scaggses' house. Defense counsel was informed from time to time of the State's efforts to identify the source of the DNA material that did not match either the victim's or appellant's DNA. At that time the State was unaware of the DPS laboratory personnel's suspicion that its samples had been contaminated. When the DPS lab personnel became suspicious of contamination, they sent other DNA samples to Lab-Corp, an out-of-state forensic testing laboratory. Later when the State was advised of DPS suspicions and told of samples being sent to LabCorp for analysis, the State requested some additional analysis.

In his opening statement to the jury, one of the prosecutors told the jury that a DNA analysis had "also turned-up something unknown . . . something unaccounted for," but that the jury would hear chemists testify that the "unaccounted for" matter was not even DNA . . . not even human DNA," but "something akin to DNA." Prior to trial, defense counsel planned a defensive theory that the unidentified DNA material was that of an unknown burglar who entered the Scaggses' home and killed appellant's wife. Therefore, defense counsel were surprised to hear the prosecutor tell the jury that the State would prove the unidentified matter discovered in the DNA analysis was not actually human DNA.

Defense counsel, relying on the agreement with the State and the pretrial discovery order, filed a motion to compel the State to disclose the evidence upon which

it based its theory related to the jury in its opening statement that the unidentified material was not human DNA. At the hearing of the motion to compel, the State assured the trial court that its theory was based on documentary evidence furnished defense counsel pursuant to the discovery order. The State asserted that the documents furnished to defense counsel gave a "hint" of the State's theory. The court ordered the State to disclose to the court, *in camera*, the basis for the claim made during its opening statement. The State gave the trial court a written note stating that documents furnished to defense counsel included a memorandum of DPS Laboratory supervisor Irma Rios concerning her fear that the DNA samples analyzed by DPS had been contaminated. The trial court, having been assured by the State that Rios's memorandum was among the documents furnished defense counsel pursuant to the agreement and discovery order, denied appellant's motion to compel. The court noted that it did not believe the defense was entitled to the disclosure sought by the motion to compel, but that nevertheless the material had already been furnished to the defense.

Later in the trial, after DPS chemist Karen Lindell testified and the defense was allowed to see Lindell's file. In reviewing the file, defense counsel discovered a copy of Irma Rios's memorandum concerning her fear of the possible contamination of the DNA samples. Defense counsel testified that they had not been furnished with the memorandum and had never before seen Irma Rios's memorandum concerning the possible contamination of the DNA samples. Although defense counsel had known that samples of DNA had been sent to LabCorp, counsel had not seen the LabCorp transmittal form in which Rios mentioned her fear of possible contamination.

The DNA samples were sent to Lab-Corp for that laboratory to determine whether DNA material other than that of appellant and the victim was contained in the samples submitted. LabCorp did not detect any contamination in the samples and found they contained only DNA of appellant and the victim. A LabCorp expert reviewed the DPS analysis records and testified that in her opinion the samples analyzed by DPS had been contaminated in some unknown way.

In summary, the record shows to a reasonable certainty that the discovery documents furnished defense counsel did not include Rios's memorandum nor the Lab-Corp transmittal form, both of which mentioned Rios's concern that the samples analyzed by DPS had been contaminated. The record does not show with reasonable certainty that the State, in bad faith, withheld from defense counsel Rios's memorandum or the LabCorp transmittal form. It is quite probable that the particular samples tested in the DPS laboratory became contaminated and that some type of material not matching either appellant's or the victim's DNA appeared in the DPS analysis. However, the DPS analysis identified DNA of both appellant and the victim, but because of the contamination other materials appeared in the DPS analysis.

Appellant's argument in support of this point of error is multifarious. Appellant argues that he was "entitled to notice of the State's theory, either on statutory or constitutional grounds." Although appellant urges that withholding information concerning contamination of the DNA samples that DPS tested constitutes a "*Brady* violation," he insists that "[r]egardless of *Brady*, however, a violation of Due Process and the Sixth Amendment has occurred." Appellant candidly "admit[s] that Article 39.14 [of the Texas Code of Criminal Procedure] does not compel disclosure of incriminating evidence, and here the contamination evidence is incriminating in the sense that it countered DNA evidence favorable to Appellant."

 Criminal defendants do not have a general right to discover evidence in the State's possession, but they have

been granted limited discovery. *See* Tex. Code Crim. Proc. Ann. art. 39.14 (West Supp.2000); *Washington v. State,* 856 S.W.2d 184, 187 (Tex.Crim.App.1993). The decision about what is discoverable is committed to the discretion of the trial court. *See Whitchurch v. State,* 650 S.W.2d 422, 425 (Tex.Crim.App.1983); *Quinones v. State,* 592 S.W.2d 933, 940 (Tex.Crim.App.1980). Here we find no violation of Article 39.14.

■ In *Brady,* the Supreme Court said: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.

. . . .

For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose.

. . . .

The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.

. . . .

If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.

*United States v. Agurs,* 427 U.S. 97, 104–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different or confidence in the outcome of the trial would be undermined. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Curry v. State,* 910 S.W.2d 490, 495 (Tex.Crim. App.1995); *Riley v. State,* 953 S.W.2d 354, 359 (Tex.App.—Austin 1997, pet. ref'd).

■ To succeed on a *Brady*–Due Process claim it must be shown: (1) the prosecution suppressed evidence, (2) the evidence was favorable to the accused, and (3) the evidence was material either to guilt or punishment. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *See Bagley,* 473 U.S. at 678, 105 S.Ct. 3375; *Lagrone v. State,* 942 S.W.2d 602, 615 (Tex.Crim.App.1997); *McFarland v. State,* 928 S.W.2d 482, 511 (Tex.Crim.App. 1996); *Riley,* 953 S.W.2d at 359.

Evidence of laboratory contamination of the samples analyzed was not, per se, evidence favorable to appellant, even though appellant was disappointed in being unable to use his planned defensive theory. *See Crane v. State,* 786 S.W.2d 338, 348–49 (Tex.Crim.App.1990); *Butler v. State,* 736 S.W.2d 668, 671 (Tex.Crim.App.1987). Evidence that the samples of DNA analyzed by DPS were contaminated during analysis was not evidence that would create a probability of a different outcome of the prosecution considering the strength of the other incriminating evidence. Regardless of the State's good or bad faith, the failure of the defense to obtain Rios's memorandum or the LabCorp transmittal form before trial did not constitute a failure to disclose favorable or material evidence in the constitutional sense. Appellant was not deprived of due process nor was there a *Brady* violation. That the DPS analysis had been contaminated was neutral evidence; it was neither inculpatory nor exculpatory. *See United States v. Dillman,* 15 F.3d 384, 390 (5th Cir.1994).

■ Appellant also contends that the failure to notify him of the contamination

of DNA samples before trial deprived him of his Sixth Amendment right to the effective assistance of counsel. Appellant claims that if he had been timely notified of the contamination of the DNA samples analyzed by DPS, he would have had independent experts of his choice analyze other samples of the DNA. Appellant employed a well recognized DNA expert who testified in appellant's defense. Appellant argues that this expert witness was handicapped by not knowing of the DPS sample contamination. As the trial court noted, appellant had not been precluded from requesting a sample of the DNA to have analyzed by his own experts before trial. The trial court also took the position that the State need not reveal its *theory* of the DPS's sample contamination. The record fails to show that appellant was deprived of his Sixth Amendment right to the effective assistance of counsel. Having considered all of appellant's argument under this point, we find no error and overrule his sixth point of error.

The judgment of the trial court is affirmed.