Opinion issued February 17, 2005













In The
Court of Appeals
For The
First District of Texas




NO. 01-03-01140-CR
NO. 01-03-01141-CR




ERIC GUNNAR BERG, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 338th District Court
 Harris County, Texas
Trial Court Cause Nos. 945666 & 945667



MEMORANDUM OPINION
          Appellant pleaded guilty to a jury to two indictments alleging aggravated
sexual assault of a child. See Tex. Pen. Code Ann. § 22.021(a)(1)(B)(iii),
(a)(1)(B)(iv) (Vernon Supp. 2004-2005). The jury assessed his punishment at 35
years for each offense, and the trial court stacked the sentences. We determine (1)
whether trial counsel was ineffective in various ways; (2) whether appellant’s Due
Process rights were violated by the presence of a domestic-violence display in the
courthouse; (3) whether the trial court erred in requiring the parties to present
evidence by affidavit at the hearing on appellant’s motion for new trial; (4) whether
the misreading of the indictment during arraignment in one cause either constituted
a total failure to admonish appellant or misled him in any way; (5) whether the trial
court erred in not withdrawing appellant’s guilty plea in both causes; (6) whether
sufficient evidence supported the guilty plea in one cause; and (7) whether appellant
waived his challenge to the State’s closing argument. We affirm.
Background
          Appellant, a 55-year-old man at the time of trial, sexually assaulted the
complainant, a close family friend, starting when the complainant was 10 years old. 
The complainant made outcry to his mother when he was about 13 years old. 
Appellant was indicted for two instances of sexual assault on the complainant. The
offenses were aggravated sexual assaults because the complainant was under the age
of 14. See Tex. Pen. Code Ann. § 22.021(a)(2)(B) (Vernon Supp. 2004-2005).
 
Ineffective Assistance of Counsel
          In his first issue, appellant asserts that his trial attorney, Don Becker, was
ineffective for various acts and omissions.
          The standard of review for evaluating claims of ineffective assistance of
counsel is set forth in Strickland v. Washington, 466 U.S. 668, 687-96, 104 S. Ct.
2052, 2064-69 (1984). See Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App.
1999); Hernandez v. State, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999) (applying
Strickland standard at punishment phase of non-capital trial). Appellant must show
both that (1) counsel’s performance was so deficient that he was not functioning as
acceptable counsel under the Sixth Amendment and (2) there is a reasonable
probability that, but for counsel’s error or omission, the result of the proceedings
would have been different, i.e., the error or omission was sufficient to undermine
confidence in the proceeding’s outcome. Strickland, 466 U.S. at 687-96, 104 S. Ct.
at 2064-69. The constitutional right to counsel does not mean the right to errorless
counsel. See Saylor v. State, 660 S.W.2d 822, 824 (Tex. Crim. App. 1983). In
determining whether counsel was ineffective, we consider the totality of the
circumstances of the particular case. Thompson, 9 S.W.3d at 813.
          It is the defendant’s burden to prove ineffective assistance of counsel. Id. A
defendant must overcome the presumption that, under the circumstances, the
challenged action might be considered sound trial strategy. Gamble v. State, 916
S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.). Assertions of
ineffective assistance of counsel must be firmly founded in the record. Bone v. State,
77 S.W.3d 828, 835 (Tex. Crim. App. 2002). We will normally not speculate to find
trial counsel ineffective when the record is silent on counsel’s reasoning or strategy. 
See Henderson v. State, 29 S.W.3d 616, 624 (Tex. App.—Houston [1st Dist.] 2000,
pet. ref’d); Gamble, 916 S.W.2d at 93. However, “in the rare case” in which the
record suffices “to prove that counsel’s performance was deficient” despite the
record’s silence concerning counsel’s strategy, “an appellate court should obviously
address the [ineffective-assistance] claim . . . .” Robinson v. State, 16 S.W.3d 808,
813 n.7 (Tex. Crim. App. 2000).
A.      Failure to Investigate
          Appellant first asserts that Becker failed to investigate and, thus, could neither
properly advise appellant concerning his pleas nor prepare adequately for trial. 
Specifically, appellant alleges that Becker (1) advised him to plead guilty before
having investigated the case, rendering the plea involuntary; (2) did not interview Dr.
Levinson, appellant’s treating psychiatrist; (3) did not obtain Dr. Levinson’s records
concerning appellant until the day before trial; (4) did not review videotaped
statements with an expert; and (4) did not obtain any medical records concerning
appellant until the State subpoenaed them. Elsewhere in his brief, appellant also
notes that Becker was not licensed for a short time before trial.
          Appellant presented the following affidavit testimony in support of these
ineffectiveness arguments. In the affidavit that Becker made for appellant, Becker
testified that he told appellant to plead guilty and to go to the jury on punishment
before Becker had reviewed the complainant’s videotaped interviews or had
interviewed appellant’s doctors. Becker also averred that he conducted no witness
interviews between March and September, although trial began on October 27, 2003. 
Appellant also submitted the affidavit of Dr. Nicholas Edd, appellant’s treating
psychologist who testified at trial for the defense, in which Dr. Edd averred that he
first met Becker only 15 minutes before trial, for no more than 10 minutes, during
which time they discussed “generally the case and the treatment of [appellant],” but
did not discuss appellant’s treatment plan. Dr. Edd also testified by affidavit that
Becker did not discuss with him “any general areas of knowledge regarding mental
illness,” the doctor’s “impressions of [appellant’s] mental illness,” the recidivism rate
for pedophilia, how that recidivism compares to the recidivism rate for other crimes,
or “any of the definitions in the DSM-4 or whether [appellant’s] condition fit any
particular diagnosis or what [appellant’s] particular diagnosis was.” Becker also
averred, in his affidavit made for the defense, that he was not a psychologist or
psychiatrist and that he did not know any of the predisposing or precipitating factors
for pedophilia.
          In the portion of the evidentiary hearing on appellant’s motion for new trial in
which live testimony was presented, Dr. Levinson testified that, had Becker requested
a meeting with her before trial, she would have met with him, but that no one from
Becker’s office did so or even called to interview her as a potential witness.


 She also
testified that Becker did not ask for her medical records concerning appellant until the
day before trial. Dr. Levinson further testified that, although she had received a
subpoena to testify on an earlier trial date, which was not reached, she did not receive
a subpoena for the actual trial date. 
          Appellant produced his own affidavit, as well. In it, appellant testified that
Becker seldom returned his frequent calls; Becker told appellant through at least part
of September that it was too early to begin investigations or to prepare for appellant’s
case and that the best time to prepare was “just before the start of trial”; Becker hired
“no other staff or private investigators” until “just prior to trial,” at which point
Becker hired only a “runner”; when he advised appellant to plead guilty in September,
Becker still had not yet reviewed the complainant’s videotaped interviews or spoken
with appellant’s doctors; after their initial meeting, Becker did not meet with
appellant again until October 14, 2003, about two weeks before trial; at their final
meeting the Friday before trial, Becker told appellant that he “had just received”
appellant’s medical records; Becker did not question any of appellant’s doctors
regarding appellant’s improvements during therapy, save for Dr. Edd, with whom
Becker met 15 minutes before trial; and Dr. Levinson did not show up for trial
because the subpoena that had been served on her had expired.
          Appellant also submitted the affidavits of two experienced criminal defense
attorneys, who opined either that it would be below the standard of care for counsel
to fail to conduct extensive preparation of records or not to spend significant time
interviewing experts in a case such as this.
          However, other affidavit testimony controverted or lessened the impact of some
of the affidavit testimony submitted by appellant. For example, in his affidavit
prepared for the State, Becker testified that, before appellant decided to plead guilty
upon Becker’s advice, Becker had reviewed the State’s file; had watched videotapes
of the complainant’s interviews; had spoken with all of the witnesses who ultimately
testified at trial; had “thoroughly investigated [appellant’s] case”; had called all of
appellant’s treating mental-health professionals and, with the exception of Dr.
Levinson, had spoken with each; had reviewed the medical records “way in advance
of trial”; had gone twice to appellant’s home to meet with witnesses whom appellant
had identified; had met appellant’s neighbors and “other witnesses,” from whom
Becker “attempted to find out what they knew about [appellant], his character, and
his background”; and had met with both prosecutors handling the case before trial to
try to negotiate a plea, although those negotiations did not succeed.
          As for Dr. Levinson, Becker’s affidavit stated that he had twice personally
attempted to contact her and that someone with his office had also contacted her, but
that the doctor had called him back twice when he was not in the office. Becker then
subpoenaed Dr. Levinson and “tried to contact her to let her know when to come and
to verify that she received the subpoena”; however, after the doctor had left a phone
message with Becker that she “would not have or make time to come to trial,” Becker
decided not to seek a writ of attachment because he felt that Dr. Edd, appellant’s
treating psychologist, would testify to essentially “the same area.”
          In his affidavit for the State, Becker also testified that, although he spoke with
Dr. Edd and Dr. Ilene Starbranch, one of appellant’s treating physicians, just before
trial, he “was aware of what they would testify to based upon [his] review of their
records, which was done way in advance of trial.” Additionally, on direct and re-direct examination of the doctors, Becker did not seem at a loss as to what to ask. For
example, he elicited from Dr. Edd the following matters, which appear to have been
intended to indicate appellant’s improvement through treatment, to show appellant’s
sincerity, and to evoke sympathy for appellant:
●Appellant was making progress in sex-offender counseling.
●The goal of sex-offender therapy is to reduce the chances of
future acting out.
 
●Motivation is probably the most important characteristic in
succeeding in that goal.
 
●Appellant had therapy sessions three times weekly, he had never
missed a session, and he exhibited a “high level” of participation
in sessions.
 
●Participation in therapy would give appellant “the tools to be able
to modify deviate behaviors and arousals, give[] him the
resources to utilize in his recovery.”
 
●Participation in therapy sessions is a “big factor” and “increases
the likelihood that a person will not reoffend.”
 
●Therapy participants, like appellant, sign a contract requiring
certain behavior when beginning therapy.
 
●Appellant had violated his contract terms twice, by allowing
others to bring children around him, but had both times
immediately reported the violations to his therapists, despite the
fact that his therapists would not otherwise have known about the
violations. Dr. Edd was aware of no other violations of
appellant’s contract.
 
●Appellant had discussed with Dr. Edd how he had arranged his
life to avoid being around children.
 
●Appellant had been honest in his self-reporting.
 
●Therapy required appellant to disclose prior sexual offenses;
appellant complied with this requirement. 
 
●Appellant, who was 55 at the time of trial, reported only one sex
crime that he had committed from his 20s through 40s.
 
●Appellant followed Dr. Edd’s advice to stop indulging in alcohol.
 
●Appellant had followed Dr. Edd’s advice to stop seeing a female
patient, apparently because that relationship could be detrimental.
 
●Appellant had suffered sexual abuse himself, which was a
significant fact because “it has something to do with establishing
his sexuality and his orientation toward people,” and appellant
demonstrated a higher-than-average level of depression and
feelings of inadequacy and had attempted suicide.
 
●Medication can be used to treat appellant’s depression, and
appellant was currently on such medication.
 
●Appellant had a very significant degree of psycho-social
maladjustment, which can be treated and is treated in the program
that appellant was attending.
 
●Appellant had a higher-than-average capacity for empathy, which
is a “highly desirable” trait and a “positive prognostic” indicator
for how someone will fare in treatment.
 
●Appellant exhibited “a multitude” of “thinking errors,” which
increase the likelihood of committing sexual offenses, when he
began therapy, but had made progress in identifying the thinking
errors and his ability to explain how they affected him and how
to reverse them.
 
●Appellant had shown a “considerable degree of remorse” to Dr.
Edd, the doctor believed in part because he had been caught, but
also because of the damage that he had caused to the victims and
their families.
 
●Dr. Edd did not know of any instances in which appellant had
engaged in physical violence toward his victims.
 
●Had appellant begun therapy 10 years prior, “the most recent
[offenses] would most likely not have occurred.”
 
●Those who have attended Dr. Edd’s program in the past had had
a “very, very low incidence of reoffending during the time that
we’ve had contact with them.”
          Becker also presented Dr. Starbranch, who testified that appellant had suicidal
ideations; that appellant suffered from a mood disorder similar to manic depression
or bipolar disorder; that that condition can increase the likelihood of a person’s
engaging in illegal or anti-social behavior if not treated; that that condition can be
treated with medication; that appellant was currently taking medication for his
condition; that appellant’s continuing to take his medication would decrease the
likelihood that he would act impulsively in any situation; and that appellant had
shown up for all of his appointments with Dr. Starbranch, although he had been late
for some.
          Becker also testified that he had spoken with appellant “on numerous
occasions.” Finally, the principal prosecutor at trial, Jamie Mostia, submitted an
affidavit averring that Becker had reviewed the State’s files at least once prior to trial;
that she had complied with a pre-trial discovery motion filed by Becker; and that she
had met or spoken with Becker “on numerous occasions” before trial “in regards to
[appellant’s] case,” including plea negotiations.
          Becker further averred that his license was suspended for only four or five days
when he fell behind on continuing-legal-education requirements; that he sought
reinstatement immediately upon being informed of his suspension the day after he had
been suspended; and that, although he did not work on appellant’s case during his few
days’ suspension, he was reinstated more than three weeks before trial began. 
          Given this record, we hold that counsel was not so deficient in preparing for
trial as to render his service constitutionally infirm.
B.      Failure to Inform Appellant of His Fifth Amendment Right Not to Testify
          Appellant also asserts that Becker failed to inform him of his Fifth Amendment
right against self-incrimination. See U.S. Const. amend. V. To substantiate this
claim, appellant presented two affidavits: his own affidavit, in which he averred that
“[a]t no time was I ever given my Miranda rights or advised of my right against self-incrimination,” and Becker’s affidavit for the defense, in which Becker admitted that
“Mr. Berg was never admonished as to the dangers of self-incrimination during the
sentencing phase by myself or by the Court.”
          However, in his affidavit made for the State, Becker averred that he had
“discussed the advantages and risks of [appellant’s] testifying. [Appellant] was aware
of those risks and advantages prior to his testifying at trial. It was our decision to
testify.” Additionally, Becker’s affidavit avers:
Eric is a likeable and nice man and I hoped that the jury would like him
as much as I and everyone else did. He had no impeachable criminal
history. Though he admitted to having [had] sexual relations with other
boys, that information was already known to the prosecutor and included
in psychiatric records . . . . During testimony, [appellant] admitted that
he was “very sick.” It was my strategy to paint [appellant] as someone
with a problem that could be treated, therefore someone who could
benefit from therapy and probation. 

In his affidavit made for the defense, Becker corroborated his reasons for having
called appellant to the stand, including that appellant testified to prove up eligibility
for community supervision, to show that appellant had no previous criminal record,
and to express appellant’s remorse to the jury.


 
          Given this disputed evidence, we hold that appellant did not show that counsel
was necessarily deficient for the reason. 
C.      Failure to Object to Evidence of Prior Bad Acts and Extraneous Offenses
 
          Appellant argues that Becker was ineffective for failing to object to testimony
of, to file a motion in limine concerning, to move to quash the State’s subpoena for
medical records containing information about, and for allowing appellant to testify
to prior bad acts and extraneous offenses. Appellant also asserts that Becker was
ineffective for failing “to object to [appellant’s] secret thoughts,” we presume
meaning appellant’s inappropriate thoughts that were discussed and recorded in
therapy.
          Appellant presented the following testimony in support of this ineffectiveness
argument. In his affidavit made for the defense, Becker testified that he “encouraged
[appellant] to continue his therapy”; that Becker failed to advise appellant “not to
make disclosures of improper conduct to anyone, including his therapists”; that
Becker “knew that [appellant’s] therapists would create business records accessible
to the State”; that he “did not file any motions to quash the State’s subpoenas” for
medical records; that he did not raise any objections during trial because he “did not
feel that any objections were necessary or well-founded”; that he did not file a motion
in limine because he “couldn’t think of anything I wanted to limine out”; and that “[i]t
was very damaging” to appellant for the jury to hear that appellant “had previously
stated something about his ‘greatest pleasure.’”
          Additionally, appellant produced his own affidavit, in which he testified that,
after he had “advised Mr. Becker that [he] had contacted a psychologist and was
seeking medical attention for my mental problems,” Becker told appellant that his
seeking psychiatric help was “good for” his case. Appellant further testified that he
“began to proceed with psychological testing, following Mr. Becker’s advice.” 
Appellant averred, “At no time was I ever given my Miranda rights or advised of my
right against self-incrimination.”
          Appellant also presented the affidavits of two experienced criminal defense
attorneys, who testified that the usual practice in aggravated-sexual-assault-of-a-child
cases is for defense counsel to hire an independent expert—to assist in preparing for
cross-examination and to help prepare, during any punishment phase, a potential
course of treatment for the client that may be presented to the factfinder—so that that
expert’s evaluations could be considered work product that would not be subject to
State subpoena. The defense-counsel affiants also testified either that “it would be
difficult to comprehend” any defense counsel’s not attempting to mitigate damaging
information revealed in medical records or not trying to fight the information’s
admission by motion in limine, motion to quash, or motion to exclude. They testified
that such failures would fall below the standard of care. 
          However, the following evidence indicates that Becker was not ineffective. 
First and foremost, although the attorney-client privilege or work-product-doctrine
protection may attach to certain communications or writings generated during a
mental-health professional’s evaluation and consultation conducted for the attorney
in preparation for litigation,


 that privilege would not attach to a treating health
professional’s records and communications if the defendant-patient himself offered
evidence of his treatment to support a defensive theory.


 The record from trial
indicates that the defense’s primary strategy was to confess to prior wrongs and
offenses, to demonstrate appellant’s honesty, to show the jury that appellant was
sincerely penitent about his prior bad acts and recognized the errors in his prior
thoughts, and to show that he was actively and successfully changing his ways
through therapy.


 An integral part of this strategy was for appellant to show that he
was in therapy and making progress. This could have been a reasonable strategy to
take given that the complainant had already made outcry; was 10 years old when
appellant began sexually assaulting him, rather than having been too young to
communicate the offense; and testified articulately and specifically as to what
appellant had done to him. Given Becker’s evident strategy, he may well have
determined that it was better to allow the State to access therapy records revealing
prior bad acts, and to open his witness to the State’s examination concerning those
acts, than to forego the strategy of appellant’s testifying fully to matters showing his
remorse, honesty, and improvement through therapy. Additionally, even if a mental-health professional had been independently consulted, appellant has not shown that
that professional would not have had to report, to the appropriate agencies, at least
the prior sexual assaults of minors that appellant revealed during consultation.



          Second, appellant’s affidavit recites that, when he initially met with Becker,
appellant advised Becker that he had already contacted a psychologist and that he was
seeking medical attention for his mental problems. Appellant points to nothing in the
record showing why he had done so before contacting Becker. Becker’s affidavit for
the defense states that he “encouraged [appellant] to continue his therapy,” not that
he talked appellant into going initially. And although appellant’s affidavit also avers
that, after his initial consultation with Becker, he “began to proceed” with therapy
“following Mr. Becker’s advice,” we have no way of knowing whether appellant
desired treatment more than he desired keeping previous criminal offenses secret,
whether Becker advised him beforehand that his therapy communications could be
subpoenaed or not. Additionally, the initial documents that appellant signed for his
mental-health providers informed him that any prior crimes against minors that he
revealed during therapy were not privileged and could be disclosed. Indeed, Dr.
Levinson’s initial disclosures advised appellant, “Statements that you make in
treatment must be recorded in the Treatment Provider’s notes. The Treatment
Provider can be subpoenaed and required to provide written records or oral testimony
in a civil, administrative, or criminal proceeding.” Appellant’s trial testimony also
revealed that appellant had not begun therapy two years earlier in part because he
knew that any child-abuse admissions that he made to a psychiatrist would have to
be reported immediately. Accordingly, discerning what motivated appellant to begin
therapy, and why Becker encouraged appellant to continue therapy, would require
speculation, which we decline to do. Cf. Gamble, 916 S.W.2d at 93.
          We hold that Becker’s challenged conduct did not render his representation
constitutionally infirm. Given the state of the record and for the reasons discussed
above, we further hold that this is not one of those “rare case[s]” in which no strategy
could explain counsel’s challenged actions. See Robinson, 16 S.W.3d at 813 n.7.
D.      Failure to Make an Opening Statement
          Appellant asserts that Becker was ineffective for failing to make an opening
statement. In support, appellant relies on Becker’s affidavit for the defense, in which
Becker averred that “[t]here was no sound strategic basis as to why I did not do an
opening statement.” However, even assuming without deciding that Becker was
deficient in this regard, we hold that appellant—who provides no explanation or
argument as to why failure to present an opening statement was so harmful as to
require reversal given the facts and posture of this case—has not shown that there is
a reasonable probability that, but for this failure, the trial’s result would have been
different. See Strickland, 466 U.S. at 687-96, 104 S. Ct. at 2064-69. 
E.      Conducting a Poor Voir Dire Examination
          Appellant also asserts that Becker was ineffective during voir dire because he
failed to conduct examinations of fragile venirepersons before the
bench. As a result, one venireperson commented that she had remorse
because of a repeat offender and one venireperson, Mr. Kahan, was
essentially offered as an expert by Becker and proceeded to undermine
treatment options. Becker then interposed his own opinion about wife
beaters.
          First, Becker began his examination by noting that a venire member had had
a “real strong reaction” when the trial court had read the charges and that she had
revealed, during the State’s voir dire, that she did not believe that she could give
community supervision because she had previously been on a jury that had done so,
only to discover later that the defendant had committed another offense. The venire
member acknowledged that she had reacted this way and had said these things. This
venire member did not serve on the jury.
          Second, in questioning the panel about whether anyone thought that, once a
person had offended, he could not be rehabilitated, Becker analogized to a wife
beater, asking whether anyone thought that such an offender would never stop
offending. Becker then asked whether anyone thought that a sexual offender who
pleaded guilty to child abuse could not be rehabilitated. Later, following up on a
response to this line of questioning, in which a venire member had commented that
one hears about reoffenders “so much” in the media, Becker asked whether the media
would report on convicted criminals who do not reoffend; the panel member
responded, “Probably not.”
          Third, Becker followed up with a venire member, Mr. Kahan, who had
indicated that he thought that those guilty of sexual offenses would reoffend. When
Becker asked what Kahan did for a living, Kahan responded that he ran a crime
victims’ office for the City of Houston, and Becker also elicited from Kahan that he
had worked with sexual offenders before and even that he “was in the paper this
morning.” Becker then questioned Kahan as follows: “Based on your
experience—and you have lots of experience. . . . [I]s it your opinion that sex
offenders can never be successfully treated?” Kahan responded affirmatively. 
Becker then continued the line of questioning with the panel. Kahan did not serve on
the jury.
          The only record evidence of Becker’s strategy came from his new-trial affidavit
made for the State, in which he explained why he did not discuss the burden of proof
or the punishment range more thoroughly, but that affidavit did not discuss the
strategy behind the matters of which appellant complains here. We will not speculate
on Becker’s reasons for his voir dire examination under these circumstances. See
Gamble, 916 S.W.2d at 93. This is simply not one of those “rare case[s]” in which
no strategy could explain counsel’s not moving to strike the entire panel or his not
seeking to voir dire certain panel members before the bench. See Robinson, 16
S.W.3d at 813 n.7. 
F.      Failure to Object to the State’s Expert
          Appellant argues that Becker was ineffective for failing to object to the
testimony of Dr. Lawrence Thompson Jr., the State’s sole testifying expert and a
clinical psychologist from the Children’s Assessment Center, because he had not been
disclosed “pursuant to court order and Brady.”
          The State did not disclose Dr. Thompson in its pretrial response to appellant’s 
motion to disclose experts. Becker did not object to the doctor’s testimony on this
basis. At the new-trial hearing, appellant presented the affidavit of an experienced
criminal-defense attorney, in which the attorney averred that failing to object to an
expert of whom sufficient notice was not received would fall below the standard of
care.
          Nonetheless, appellant’s brief does not explain why Becker’s failure to object
could not be considered part of a valid trial strategy or how the failure to object might
have harmed appellant under Strickland. Simply put, nothing shows why Becker did
not object, and we decline to speculate about it. See Gamble, 916 S.W.2d at 93.
G.      Failure to Move for Directed Verdict in Trial Court Cause Number
945667

          Appellant asserts that Becker was ineffective because he did not move for
directed verdict in trial court cause number 945667, in which appellant was charged
with contacting the complainant’s anus with appellant’s sexual organ. Specifically,
appellant argues that the only evidence presented was of (1) attempted penetration,
not penetration, and (2) that the testimony showed that the attempted penetration
occurred on the complainant’s “butt,” not his “anus.” Appellant also supports his
challenge with Becker’s affidavit testimony for the defense, in which Becker testified
that he had “no sound strategic basis” for not having moved for directed verdict.
          A motion for directed verdict is proper when, viewing all of the evidence in the
light most favorable to the State after it rests, no rational trier of fact could find the
disputed element of the crime beyond a reasonable doubt. See Canales v. State, 98
S.W.3d 690, 693 (Tex. Crim. App. 2003) (applying this standard of review to an
appellate challenge to the denial of a directed-verdict motion, which the court
construed as legal-sufficiency challenge).
          Appellant was charged with causing his sexual organ to contact, not to
penetrate, the complainant’s anus. See Tex. Pen. Code Ann. § 22.021(a)(1)(B)(iv)
(establishing that offense committed when person intentionally or knowingly “causes
the anus of a child to contact the mouth, anus, or sexual organ of another person,
including the actor.”) (emphasis added). It is possible to make contact when
attempting penetration. Moreover, appellant and the complainant both testified that
appellant ceased attempting to penetrate the complainant because doing so was
hurting the complainant; this testimony established contact. And, viewing appellant’s
testimony in the light most favorable to the verdict, the jury could reasonably have
equated “butt” with anus, especially given appellant’s testimony that he attempted
penetration (which would usually be considered possible only with the anus, not with
the buttock) and that the complainant complained of pain. Counsel is not deficient
for not moving for a directed verdict on a charge that had evidence to support it. See
Collum v. State, 96 S.W.3d 361, 367 (Tex. App.—Austin 2002, no pet.) (“[C]ounsel
does not render ineffective assistance of counsel by failing to preserve an error that
is not reversible.”).           
H.      Failure to Offer “Treatment Plan” for Appellant
          Appellant also argues that Becker was ineffective for failing to offer a
“treatment plan” for appellant. 
          In support of this ineffectiveness argument, appellant presented the affidavit
of an experienced criminal-defense attorney, who opined that it is below the standard
of care for defense counsel “not to have a treatment program to present to the jury as
an alternative to incarceration” in this type of case.
          In his affidavit for the State, however, Becker explained:
I did not prepare a “treatment plan” for the jury to consider, as they
would not determine the specific conditions of [appellant’s] probation;
that would be for the Judge to decide. In addition, Dr. Edd and
[appellant] had both gone over [appellant’s] treatment plan thoroughly
during the punishment phase of trial. Therefore, any treatment plan that
I would have suggested, would not necessarily have been put into
practice.

Given this explanation, we decline to hold that counsel was deficient in this regard. 
Even if Becker were deficient in this regard, we hold that there is not a reasonable
probability that, but for that error, the trial’s results would have been different. This
is because, as Becker’s affidavit indicates, Dr. Edd and appellant testified as to how
long appellant would need therapy and what requirements and restrictions should be
imposed on him if he were to succeed in therapy.



I.       Closing Argument
          Appellant argues that Becker made an “egregious” closing argument, during
which Becker allegedly (1) likened appellant to a wife-beater, a drunk, a drug addict,
or a compulsive gambler; (2) argued “outside the record that there were five child
victims”; and (3) “tantalized the jury” with killing appellant, and, because that was
not a punishment option, explained that appellant could instead receive any sentence
from life in prison to community supervision.
          First, Becker described appellant in closing as “a person who is sick” and
stated:
Why did [appellant] do what he did? I think it’s pretty clear. It’s just
like a person who is a drunk. It’s like a person who is a drug addict. It’s
[sic] a person that can’t control gambling. They are sick. They are sick
people. [Appellant] was a sick, sick person who did sick, sick things. 


However, Becker’s affidavit for the State explained:
During testimony, [appellant] admitted that he was “very sick.” It was
my strategy to paint [appellant] as someone with a problem that could
be treated, therefore someone who could benefit from therapy and
probation. Any reference to [appellant] as “sick” or like an addict was
made in an effort to evoke sympathy and mercy.

This is a valid strategy. Additionally, Becker’s statements about appellant cannot be
considered in a vacuum. Becker argued repeatedly that community supervision was
appropriate; that appellant “stepped up to the plate” by admitting that he had done
wrong and that he was sick and needed help; that his victims were teenagers, as
opposed to infants or very young children; that he had no prior criminal history and
had always had a job; that he had friends who stood by him despite knowing what he
had done; that he was remorseful; that he was honest (by, among other things,
revealing past offenses and admitting that he had violated his therapy agreement by
being around children, when his therapists would not have otherwise known these
things); that he wanted to change through therapy; that he was attending therapy and
making progress; and that appellant would have to comply with specific requirements
if he were given community supervision, so that there would be “plenty of safeguards
so other children or young men in the community will be safe.”
          Second, Becker mentioned five child victims about whom the jury had heard
testimony. Contrary to appellant’s assertion, however, there was evidence of four
actual victims, counting the complainant here, and of one attempted victim. Dr. Edd
testified that there were “five” victims and then named each of them: the complainant,
D.F., Bill (appellant’s nephew), Chuck, and Jim, the last of whom appellant
“approached . . . sexually and tried to engage . . . sexually,” but “backed off” when
Jim rebuffed appellant. It was to these five individuals—either attempted or
actual—whom Becker and the prosecutor referred during closing arguments by the
phrase “five victims.” Becker was not deficient for using this phrase to refer to the
five boys.
          Third, near the start of his closing argument, Becker argued:
So what do we do with an Eric Berg? Can’t kill him. It’s not an option. 
We have the option of five years probation to [sic], to make him spend
the rest of his life in prison. Those are the options you have.
 
During voir dire, when Becker was asking the panel if anyone thought that sexual
offenders would necessarily reoffend, one panel member exclaimed, “One treatment
for sex offenders that is guaranteed to work—(indicating).” Becker responded,
“Well, I’m not going to get into that.” The record does not reveal what the venire
member gestured. The venire member’s unrevealed gesture might explain why
Becker, in closing argument, mentioned that capital punishment was not an option. 
Regardless, nothing in the record expressly shows why Becker made this statement. 
For this reason, and also given the ambiguous gesture and comment made by the
venire member earlier, we decline to speculate what Becker’s strategy was. See
Gamble, 916 S.W.2d at 93.
J.       Post-Trial Deficiencies
          Appellant argues that Becker was ineffective for failing to object that
appellant’s punishment was cruel and unusual and for being “absent from Motion for
New Trial testimony.” Both complaints are waived because appellant cites no
authority and includes no argument or analysis in support of either. See Tex. R. App.
P. 38.1(h); Jones v. State, 119 S.W.3d 766, 784 (Tex. Crim. App. 2003) (“Appellant
does not . . . present any argument or authority in support of his claim . . . . Appellant
has therefore failed to adequately brief this . . . issue.”) (citing Tex. R. App. P.
38.1(h)).
K.      Failure to Hire Mental-Health Professionals So As to Shield Examination
          Appellant asserts that Becker was ineffective because he did not hire mental-health professionals to examine appellant, so that appellant’s medical records would
be subject to work-product privilege. We have already addressed and rejected this
contention in our discussion concerning Becker’s failure to object to evidence of
extraneous offenses and prior bad acts.
L.      Counsel’s Overall Representation
          In addition to his actions set out above, Becker moved pre-trial for inspection
and discovery. He reached an agreement with the State for “mutual discovery of
experts 20 days before trial.” He presented eight witnesses on appellant’s behalf, one
of whom was appellant’s treating psychologist, and another of whom had been a
treating physician. The remaining witnesses were neighbors, co-workers, and friends
of appellants, many of whom testified that they knew the general charges against
appellant but considered him a good person or a friend nonetheless. Becker
conducted a lengthy direct examination of appellant, for 31 pages of the reporter’s
record, in which appellant testified to matters showing remorse, honesty, contrition,
improvement through therapy, and the desire not to reoffend and in which he was
clearly trying to evoke sympathy.
M.     Conclusion
          We hold that either Becker’s overall representation was not constitutionally
deficient or that, if it was deficient in some respects, those deficiencies did not
undermine confidence in the proceeding’s outcome. See Strickland, 466 U.S. at
687-96, 104 S. Ct. at 2064-69. We overrule appellant’s first issue in its entirety.
Jurors’ Possible Viewing of Family-Violence Display
          In his third issue, appellant argues that his “sentencing hearing violated due
process when the jury was allowed to see” a domestic-violence display within the
courthouse because the display “had an impact on the jury and was an outside
influence . . . .”
          The complained-of display was about 20-feet long and hung from floor to
ceiling inside the courthouse, on the second floor, on which was also located the
courthouse cafeteria. Jurors, court personnel, and other visitors ate lunch there. The
display consisted of a collage of artwork and writings made by victims of domestic
violence and by the District Attorney staff who worked with those victims. The
display was put up because October, the month of appellant’s trial, was National
Domestic Violence Awareness Month.
          Appellant’s affidavit stated that the children’s artwork and writing “begg[ed]
the persons who saw the display from letting persons charged with child molestation
from getting away.” Appellant averred that one young girl’s letter “begg[ed]
protective services to not let her daddy come home and beat her and mommy again”
and that some pictures in the display had “stick figures of young children and mothers
with daddy’s (stick figure) figure having a penis drawn on with an arrow pointing to
it and listing the penis by ‘person’s name.’” Appellant averred that the stories told
in the display by the children “were very heart wrenching and distressful.” In
contrast, the affidavit of the District Attorney’s Director of Family Violence Services,
Jennifer Varela, stated that the artwork in the display was about domestic violence
and implied that appellant had misinterpreted the display to concern child
molestation. Varela’s affidavit also attached one child’s drawing—the drawing to
which Varela believed that appellant was referring when he described a display
picture with an arrow pointing to a father’s penis—which showed a mother, father,
an child and had an arrow pointing to the pregnant mother’s stomach with the
notation that “Zach” was the unborn child’s name. Becker testified in his affidavit
made for the State that he “did see jurors in this case look at the display.”
          Although some jurors saw the display, Becker’s affidavit for the State
explained that he did not challenge the matter because he “did not want to draw any
more attention to the jurors about the display, which would have happened if the
Judge would have [sic] questioned the panel about what was depicted.” Additionally,
the best witnesses to testify to any subjective influence that the display may have had
over the jury’s deliberations were the jurors themselves.


 Although the trial court
quashed all juror subpoenas and required the new-trial hearing to be conducted by
affidavit, the court in no way forbade the defense from presenting juror affidavits. 
Appellant did not do so. 
          Accordingly, we overrule appellant’s third issue.
 
Denial of Ability to Conduct Full Evidentiary Hearing
On Motion for New Trial

          In his second issue, appellant contends that “[t]he trial court erred by refusing
to allow the defense to continue with their [sic] evidentiary hearing and instead
relying upon affidavits,” thereby violating the Rules of Appellate Procedure and his
due process rights and preventing him from meaningful cross-examination. 
Specifically, appellant asserts that (1) jurors needed to testify live so that they could
explain the effect of the family-violence display and their improper consideration of
parole during deliberations; (2) he needed to probe the inconsistencies between
Becker’s competing affidavits; (3) “only after [an evidentiary] hearing could the trial
court make an informed decision whether to grant or deny the Motion for New Trial”
(emphasis in original); and (4) he was not allowed to obtain affidavit testimony of
prosecutor Mostia and Varela, both of whom supplied new-trial affidavits for the
State.



          Appellant did not object at the new-trial hearing on the basis of due process,
but instead on the basis of the Confrontation Clause. Thus, appellant has not
preserved his Due Process argument for review. See Tex. R. App. P. 33.1(a). 
Furthermore, to the extent that appellant complains that the trial court erred in
refusing live testimony of Mostia and Varela (or Becker) to the extent that he could
not obtain any affidavit testimony from them between the pertinent new-trial
hearings, he has waived those complaints for failure to raise them as objections and
to obtain rulings.


 See Tex. R. App. P. 33.1. Moreover, at a new-trial hearing, “[t]he
court may receive evidence by affidavit or otherwise.” See Tex. R. App. P. 21.7;
Scaggs v. State, 18 S.W.3d 277, 281 (Tex. App.—Austin 2000, pet. ref’d) (“In
hearing the motion for new trial, the trial court may receive evidence by affidavit or
otherwise. If they are offered and admitted in evidence, sworn motions and affidavits
may serve as proof of allegations for a new trial.”). The trial court was well within
its authority to require testimony by affidavits at the new-trial hearing, and appellant
has not shown that anything about that ruling violated the Confrontation Clause or
the appellate rules.


 See Ammons v. State, 2003 WL 1906404, No. 07-02-0123-CR,
at *5 (Tex. App.—Amarillo Apr. 18, 2003, no pet.) (memo. op., not designated for
publication) (rejecting contention that requirement to present attorney’s testimony by
affidavit at new-trial hearing, rather than by live testimony, was abuse of discretion
under rule 21.7 or violated Confrontation Clause, the latter holding being made
because appellant had not cited authority other than constitutional provision itself).
          In addition, we note that the procedural posture of the case supports the trial
court’s decision to receive new-trial testimony by affidavit. Appellant filed his
motion for new trial on December 1, 2003, 34 days after sentence was imposed. On
December 8, 2004, appellant and the State agreed to reset the new-trial hearing until
January 7, 2004, a Wednesday—the 71st day after sentencing and just five days
before the trial court’s power to decide the motion would expire on Monday, January
12, 2004. See Tex. R. App. P. 21.8(a). On January 7, the trial court was in the middle
of another trial, but it allowed appellant to present Dr. Levinson for live testimony on
his motion. At the end of that testimony, the trial court had to continue the hearing
until Friday, January 9 because of the on-going trial. When the parties arrived on the
morning of January 9, the trial court advised them that the trial was still on-going and
that the jury would be returning shortly. The trial court then ruled that it would allow
the remainder of the new-trial evidence by affidavit alone, given time constraints
brought on by trial and by the court’s plenary power’s expiring in three days, and it
continued the hearing until the following Monday morning. The trial court offered
to allow appellant through late Monday afternoon to obtain any affidavit testimony
that he needed. Given the fact that another trial was on-going the week before the
court’s plenary power expired and that, on the 41st day after sentencing, appellant
had agreed to postpone the hearing until the 71st day after sentencing, it is not
surprising that the trial court both determined that it would have to proceed on
affidavit testimony alone and that it would overrule appellant’s objections to its doing
so.
          We overrule appellant’s second issue. 
Misreading of Indictment at Arraignment
          In his fourth issue, appellant asserts that he was arraigned in trial court cause
number 945667 (appellate cause number 01-03-01141-CR) on a crime for which he
had not been indicted because the indictment was misread.


 See Tex. Code Crim.
Proc. Ann. art. 26.11 (Vernon 1989) (requiring, at arraignment, that indictment be
read and that defendant be asked if he is guilty or not). Appellant relies on what he
claims is an analogous line of case law holding that the total failure to admonish a
defendant under Code of Criminal Procedure 26.13, or an incomplete arraignment
under that article, is error.


 
          We reject appellant’s underlying assumption that the law applying to
admonishments, which are generally given after arraignment to determine that a plea
is knowingly and voluntarily made,


 can be applied to an arraignment, the purpose
of which is merely to ascertain the defendant’s identity and to receive his plea.


 
Appellant cites no authority that applies the law of admonishments on which he relies
to an arraignment. 
          Moreover, law exists that specifically governs the arraignment process, and that
law requires a defendant to object timely to both the total failure to arraign and to
irregularities concerning the arraignment to preserve error. See Mulder v. State, 707
S.W.2d 908, 917 (Tex. Crim. App. 1986) (holding that total failure to arraign was
waived for lack of timely objection); see Craig v. State, 480 S.W.2d 680, 684-85
(Tex. Crim. App. 1972) (overruling challenges to prosecutor’s alleged alteration of
indictment, supposedly contrary to statute governing indictment’s amendment, at
arraignment, and to jury, because appellant did not object and because record did not
show what was read); Stewart v. State, 693 S.W.2d 11, 15 (Tex. App.—Houston
[14th Dist.] 1985) (holding that appellant waived procedural error in arraignment for
failing to object), aff’d on other grounds, 718 S.W.2d 286 (Tex. Crim. App. 1986). 
Appellant did not object at any time to the indictment’s misreading. Accordingly, we
hold that he has waived this challenge. See id.
          We overrule appellant’s fourth issue.



Withdrawal of Guilty Plea
          In his fifth issue, appellant asserts that “the trial court erred by failing to
withdraw the plea to [trial court cause number] 945667 because of evidence of
innocence.” 
“When evidence introduced before a jury (when a defendant has entered
a guilty or nolo contendere plea) makes evident the innocence of the
accused or which reasonably and fairly raises an issue as to such fact
and such evidence is not withdrawn, the trial court is required, sua
sponte, to withdraw the accused’s guilty or nolo contendere plea and
enter a not guilty plea for the accused. . . . For the rule to come into play
the evidence must go farther [sic] than just tending to show a defensive
issue, it must reasonably and fairly present such issue before the trial
court is required to withdraw the guilty or nolo contendere plea.”

Montalvo v. State, 572 S.W.2d 714, 715 (Tex. Crim. App. 1978) (quoting Varela v.
State, 553 S.W.2d 111, 112 (Tex. Crim. App. 1977)) (citations omitted). However,
that is not the case here. For the reasons that we explained in discussing appellant’s
challenge that Becker was ineffective for not moving for directed verdict in this
cause, we hold that there was evidence showing appellant’s guilt. Appellant points
to no other evidence allegedly showing innocence in this cause. We thus reject
appellant’s contention that the trial court erred in failing to withdraw his plea sua
sponte.
          Appellant also argues that he filed a motion requesting that his plea be
withdrawn. The document to which appellant refers is a motion that appellant filed
on October 27, 2003, the date that trial began, entitled “Defense Motion at Time of
Entering Plea of Not Guilty,” the purpose of which was to request that a jury assess
punishment.


 The use of the form motion was a patent mistake because, on that same
day, appellant pleaded guilty before the court and then again before the jury; he had
indicated in writing 20 days earlier that he would plead guilty; and the entire course
of the proceedings—the evidence presented, the theories that the parties espoused,
the trial court’s voir dire comments (to which appellant did not object), and the
arguments that both counsel made—indicates that everyone understood that appellant
was actually pleading guilty. Moreover, the document to which appellant refers did
not request that his plea be withdrawn.
          Accordingly, we overrule appellant’s fifth issue.
          Sufficiency of the Evidence Supporting the Guilty Plea
          In his sixth issue, appellant asserts that “the conviction for [trial court cause
number] 945667 should be reversed as there was insufficient evidence to substantiate
the plea.”
            We assume, although he does not say so expressly, that appellant’s argument
is based on the belief that there was no evidence that appellant’s sexual organ
contacted the complainant’s anus. We reject appellant’s argument for the same
reasons that we have rejected it above in our discussion of whether Becker was
ineffective for not moving for directed verdict and in our discussion of whether the
trial court erred in not sua sponte withdrawing appellant’s guilty plea. Moreover,
“[i]n felony cases, a plea of guilty before the jury ‘admits the existence of all
necessary elements to establish guilt, and in such cases, the introduction of testimony
by the State is to enable the jury to intelligently exercise the discretion which the law
vests in them touching the penalty to be assessed.’” Holland v. State, 761 S.W.2d
307, 312 (Tex. Crim. App. 1988) (quoting Ex Parte Williams, 703 S.W.2d 674 (Tex.
Crim. App. 1986)).
          We overrule appellant’s sixth issue.
          State’s Closing Argument
          In his seventh and final issue, appellant complains of three allegedly improper
closing arguments by the State.
 
          Appellant did not object to any of the complained-of arguments. Accordingly,
he has waived his complaints. See Valencia v. State, 946 S.W.2d 81, 82-83 (Tex.
Crim. App. 1997) (holding that defendant must object to improper closing
argument—even incurable argument—to preserve error).
          We overrule appellant’s seventh issue. 
 ConclusionWe affirm the judgment of the trial court.
 

 
Tim Taft
Justice

Panel consists of Justices Taft, Jennings, and Bland.

Do not publish. See Tex. R. App. P. 47.2(b).