COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-242-CR

 

 

CHRISTOPHER WAYNE                                                                    APPELLANT

SCRANTON

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

          FROM
CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I. 
Introduction








Gunmen
breached the back door of an Arlington gaming establishment around closing time
and stripped the cash from an elderly employee=s
wallet.  Police captured Appellant
Christopher Wayne Scranton a few hours later and presented him for a field
show-up to an eyewitness who had tried to bar the door as the robbers broke
in.  Appellant now appeals his
convictions on two counts of aggravated robbery, contending that the pretrial
field show-up was impermissibly suggestive and that the evidence is legally and
factually insufficient.  Because we hold
the trial court did not abuse its discretion by denying Appellant=s
motion to suppress identification and because we hold the evidence is both
legally and factually sufficient to support the jury=s
verdict, we affirm the trial court=s
judgment.

II. 
Factual Background

Around
midnight on May 10 going into May 11, 2008, Appellant parked his red F-150
pickup truck on the side of the Joy Game Room, a gaming establishment at the
corner of South Collins and East Mayfield in Arlington.

Marcus
Linton spent five days a week at the game room, sometimes helping out with odd
jobs such as cleaning up and re-stocking the refrigerator.  On May 10, he had been helping set up a
security camera when around 2:00 a.m., closing time, he stepped out front to
move the car he had borrowed to the alley in the back so that passers-by would
not think that the business was still open while he stayed to play some of the
machines after hours.

As
he wheeled the car around to the alley, he passed near Appellant=s
red pickup truck backed up against the building.  The truck=s Adim@
lights were on and two people were in the front seat: a black man sitting
upright behind the steering wheel and someone else bent down in the passenger
seat beside him.








Marcus
thought it was Anot normal@ for
a vehicle to be parked that way and on that side of the building at that time
of night.  As he passed the front of the
truck, the passenger=s face was below his line of
sight and the driver acted as though he wanted to avoid being noticed.

Marcus
continued into the alley, parked behind the building, climbed out of the car,
and tapped on the game room=s
back door.  Someone let him in, and after
stepping inside and locking the door behind him, he realized that he had left a
friend=s
cell phone in the car.  He turned to
unlock the door, and when he set foot outside, he saw two people standing close
by.  He immediately retreated inside and
tried to close the door when a pair of hands grabbed hold from the outside.

Riley
Kemp was the manager in charge of the late shift.  Standing in the doorway between the main and
back areas, he turned from the customer he had been assisting to see Marcus
struggling to close the back door.

Marcus
had almost succeeded when another pair of hands from the outside grabbed the
door.  But Marcus released his grip when
the muzzle of a handgun penetrated the opening and pressed against his
forehead.

For
a moment, Marcus locked eyes with the man holding the gun.  Then, fearing that he was either going to be
hurt or killed, Marcus stepped aside and two gunmen (the second armed with a
shotgun) threw the door open and burst inside.

The
intruders, bundled up in multiple layers and hooded sweats, trained their
weapons at Marcus and Kyong Son, a seventy-year old employee who had been
helping clean up, and ordered them face-down on the floor.








Watching
from the main area of the game room, Riley called 911 and began quietly
escorting the fifteen or so customers toward the front entrance and out of the
building.  As Riley talked with the 911
dispatcher, the men in the back realized that the keys to the money were
evidently on the opposite side of the building with Riley at the front
entrance.  Frantically looking for
something to steal, they kicked open the locked office door located in the back
area.  Finding nothing valuable there,
one of the men snatched the wallet from Son=s
back pants pocket, stripped it of its sixty dollars in cash, and stuffed it
back in Son=s
pants.  Then they made for the back door,
slammed it shut, and dashed through the alley. 

Riley
hurried to the back, opened the door, and instructed Marcus to see if he could
tell where the men went.  Marcus took off
running down the alley.

The
robbers barreled north along the wooden privacy fence that extended behind the
game room toward Mayfield Street.  Marcus
followed on the opposite sidewalk as they circled back onto Mayhill Court and
continued south down that street, disappearing through an open gate between two
houses at the end of the cul-de-sac. 
Within seconds, a patrol car pulled up to Marcus, who climbed in and
collapsed onto the backseat.








Another
patrol car stopped at the end of the cul-de-sac, and Officer Robert Muguerza
climbed out and entered the backyard where the robbers had disappeared.  He spotted two suspects in the large open
field across the fence.  They ran west,
crossing Collins and a church parking lot before vanishing into the adjoining
neighborhood.

The
officer who had picked up Marcus returned him to the game room, asking on the
way whether Marcus would be able to recognize the robbers if he saw them
again.  Marcus replied that he would Abecause
that=s
all I remembered was the face.@

In
the game room parking lot, officers ran a license check of the red pick-up
truck backed up against the building; it was registered to Appellant.

The
police set up a containment perimeter encircling several blocks around the game
room.  Officer Frank Smith had taken a
position northwest of the game room when he heard that a suspect had been seen
running northbound on Collins.  He headed
that way and picked up Lehman Mintor running northbound on the west side of the
street.

The
officer took Lehman to the game room parking lot and presented him to Marcus
for a field show-up.  Illuminated by
bright lights and wearing handcuffs behind his back, he stood approximately
twenty yards from Marcus, who was hidden behind the lights.  Marcus could not identify him.








In
the meantime, Officer Muguerza and his police dog had relocated to Shea Court,
just to the west of the church grounds where the suspects had last been
seen.  The dog sniffed out Eddie Beasley,
who was barefoot, wearing only a T-shirt and shorts, hiding in a flower bed.  Officers took Eddie into custody and transported
him to the game room parking lot where he was presented to Marcus in the same
manner that Lehman had been a half hour before. 
Marcus immediately recognized him as one of the robbers.

After
Lehman had been cleared for release, Officer Smith was taking him south on
Collins when he saw another suspect in a white T-shirt and jeans running
northbound through the church grounds from the wooded area where Eddie Beasley
had been tracked.  Officer Smith radioed
the suspect=s
position and description, dropped off Lehman, and took up a position on the
south perimeter.

A
911 caller reported seeing someone running and crouching behind fences in a
neighborhood to the northwest of the game room. 
Officer Smith drove to that location and saw the same suspect he had
seen running on CollinsCnow without a shirt and with
his jeans rippedCcoming out of a backyard at
408 Thomas Lane.  Officer Smith cruised up
from the rear with his lights off.  When
the suspect noticed the patrol car, he started jogging.  Pulling up alongside, Officer Smith asked him
what he was doing, to which he replied that he was going for his Amorning
jog.@  When the suspect identified himself as
Appellant, Officer Smith recognized the name from the license-plate check of
the pickup truck at the game room. 
Officer Smith ordered Appellant into the patrol car and transported him
to the game room parking lot where he was presented to Marcus for a field
show-up in the same manner as Lehman Mintor and Eddie Beasley had been
before.  Marcus immediately and
unequivocally identified Appellant as the gunman with whom he had earlier
locked eyes at the back door of the game room. 








Crime
scene investigators discovered a .45 caliber handgun and a sawed off .410
shotgun in the field behind the fence where Marcus had chased the robbers.  Inside the fence, officers also found several
articles of clothing, including hooded jackets and gloves.  Subsequent DNA testing of the clothing
matched some of the articles to Eddie Beasley and some to Appellant.

A
jury convicted Appellant on two counts of aggravated robbery.  Appellant pleaded true to habitual-offender
paragraphs alleging prior convictions for robbery and aggravated robbery.  The trial court assessed Appellant=s
punishment at fifty years= confinement on each count,
ordering the sentences to run concurrently.

III. 
Sufficiency of the Evidence

In
his second issue, Appellant challenges the legal and factual sufficiency of the
evidence.  He does not dispute that the
evidence shows the commission of an aggravated robbery, but he contends that
the evidence is insufficient to show that he committed it.

In
reviewing the legal sufficiency of the evidence to support a conviction, we
view all of the evidence in the light most favorable to the prosecution in
order to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.[2]








When
reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party.[3]  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s
determination is manifestly unjust.[4]  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, although legally sufficient, contradicts the
verdict.[5]

Unless
we conclude that it is necessary to correct manifest injustice, we must give
due deference to the factfinder=s
determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@[6]  Evidence is always factually sufficient when
it preponderates in favor of the conviction.[7]








Viewed
in the light most favorable to the verdict, the evidence presented in this case
is legally sufficient to support the jury=s
implied finding expressed in its verdicts that Appellant was one of the
robbers.  Appellant=s
vehicle was parked at the robbery location before, during, and after the
robbery; his DNA was detected on clothes dumped into a backyard along the
robbers=
escape route; two weapons matching the descriptions of those used in the
robbery were found on the other side of the fence; a police officer observed
Appellant running in a white T-shirt and jeans from an area where the robbers
were last seen and subsequently found him emerging from a backyard without the
T-shirt and with his jeans ripped; Appellant had been walking up to the time
that he noticed the patrol car behind him, but then feigned jogging when he saw
he was being followed; and an eyewitness who tried to keep the door closed
against the robbers= entry and who testified
that he looked into Appellant=s
eyes when Appellant held a gun to his forehead positively identified Appellant
as one of the robbers.  We overrule this
part of Appellant=s second issue.








In
support of his claim that the evidence is factually insufficient to show that
he was one of the robbers, Appellant argues that the field show-up procedure
was unreliable because Marcus was high on drugs and even if he was sober, it is
doubtful that his view of the assailants was sufficient to identify him in a
line-up.  He also suggests that Marcus=s
identification of Appellant as one of the robbers was tainted by Marcus=s
motivation to catch the robbers because he felt guilty for letting them in and
because the police pressured him to make an identification.  Finally, he asserts that he parked beside the
game room within walking distance of his girlfriend=s
home to avoid having his truck repossessed. 
Viewed in a neutral light, however, we find nothing in the record
suggesting that the jury=s resolution of these issues
of weight and credibility resulted in verdicts that were clearly wrong or
manifestly unjust.  Nor do we find that
the evidence supporting the verdict is particularly weak or that it is outweighed
by any evidence that conflicts with the verdict.  We overrule this part of Appellant=s
second issue.

IV. 
The Field Show-up

In
his first issue, Appellant claims that the trial court abused its discretion
when it denied his motion to suppress evidence that Marcus positively
identified him as one of the robbers. 
The State responds that Appellant failed to preserve this issue for our
review.








Although
the State acknowledges that the trial court granted Appellant a running
objection out of the presence of the jury on Athe
identity issue,@ the State argues that
because Appellant requested his running objection during the testimony of one
witness, he was required to re-urge his objection when the same evidence came
in during the testimony of another.  In
other words, the State argues, his running objection applied to only one
witness, specifically, to the testimony of Officer Stevens on the issue of
Marcus=s
identification of Appellant as one of the robbers and not to Marcus=s
testimony, which was presented later in the trial and which Appellant did not
specifically object to.  The State contends
that when Marcus later testified to having identified Appellant as one of the
robbers, Appellant was required to raise another objection to preserve any
error in the admission of his testimony about Marcus having identified
Appellant.

In
support of its position, the State cites two cases from the court of criminal
appeals,  Sattiewhite v. State[8]
and Goodman v. State,[9]
and two cases from our sister courts in Austin and Tyler, Scaggs v. State[10]
and White v. State,[11]
respectively.  In addition, the State
cites Ford v. State,[12]
a more recent case, which it candidly acknowledges cuts against its position.








Also
citing Ford, commentators have noted that A[a]
properly framed running objection can extend to testimony by all witnesses
pertaining to the same type of evidence.@[13]  In Ford, when the decedent=s
mother was called to testify, the appellant stated, AYour
Honor, I would ask that my running objection extend to all witnesses, if they
testify to the same type of matter.@[14]  The trial court responded, AAll
right.  I note your objection.  I=ll
grant your running objection on this issue and overrule it.@[15]  On appeal, the Ford court held that
the appellant had preserved his claim for review: A     The record reflects that appellant was
clearly objecting >to any and all impact
evidence= as >to
all witnesses=
testifying to such.  The trial court
clearly understood such complaint and ruled adversely thereon.  We conclude that appellant has preserved his
claim for review.@[16]

The
record in this case shows that outside the jury=s presence,
Appellant specifically objected to Aany
testimony regarding [Marcus=s]
identification of [Appellant]@ and
the trial court granted a running objection Aas
to the identity issue.@

MR. SCOTT [for Appellant]:  Your Honor, at this time I would make a
motion that any eyewitness identification in regards to Mr. Scranton be
suppressed.  I think the show-up lineup
or the show-up that was done that night was highly prejudicial.  It=s going to be suggestive to Mr. Linton.  And I don=t think that much probative value can be
had.  I think it=s more highly
prejudicial to the defendant.  I think
there=s better ways they
could have done some type of identification.

 

And I don=t think that there should be any
testimony regarding Mr. Linton=s identification of
Mr. Scranton due to the high probability of suggestive nature of the show-up
lineup.  I mean, one, he was in
handcuffs; two, he had already identified a previous person; and, three, I don=t think that he has
sufficient options in which to decide whether or not this was one of the suspects.

 

THE COURT: 
Let me ask one question.  He had
also failed to identify one person that you brought in as a suspect that you
used the same procedure to show; is that correct?

 

THE WITNESS: 
Yes, Your Honor.

 








THE COURT: 
Actually, there were three people that you showed him out there that
night?

 

THE WITNESS: 
Yes, sir.

 

THE COURT: 
Okay.  All right.  I=m going to overrule your objection.

 

MR. SCOTT: 
And I would like a running objection as to BB 

 

THE COURT: 
That=s fine.  You can have your objection as to the
identity issue.

 

MR. SCOTT: 
Thank you, Your Honor.

 

THE
COURT:  Bring in the jury.  [Emphasis added.]

We
think it clear from the record that Appellant properly framed his running
objection and that the trial court granted it to apply to all witnesses
testifying on Marcus=s eye-witness identification
of Appellant.  Accordingly, we hold that
Appellant has preserved his claim for review.[17]

The
State also argues that Appellant failed to preserve his claim because although
he argued to the trial court that the identification procedure was suggestive,
he did not argue that it was impermissibly so nor did he argue that the
procedure led to his mistaken identification by the witness.








Although
there are no technical considerations or forms of words required to preserve an
error for appeal, a party must be specific enough so as to Alet
the trial judge know what he wants, why he thinks himself entitled to it, and
do so clearly enough for the judge to understand him at a time when the trial
court is in a proper position to do something about it.@[18]  A general or imprecise objection is
sufficient to preserve error only if the legal basis for the objection is
obvious to the trial court and opposing counsel.[19]  Whether the specific grounds for the
objection were apparent from the context of the objection is determined by
looking at each situation individually as it arises.[20]

Our
review of the discussion between Appellant and the trial court set out in the
record leads us to conclude that the trial court clearly understood the basis
for Appellant=s
objection.[21]  Therefore, we shall address the merits of
Appellant=s
complaint.








We
review a trial court=s ruling on a motion to
suppress evidence under a bifurcated standard of review.[22]  We give almost total deference to a trial
court=s
rulings on questions of historical fact and application-of-law-to-fact
questions that turn on an evaluation of credibility and demeanor, but we review
de novo application-of-law-to-fact questions that do not turn on credibility
and demeanor.[23]

A
pretrial identification procedure may be so suggestive and conducive to
mistaken identification that subsequent use of that identification at trial
would deny the accused due process of law.[24]

Whether
an identification procedure was so impermissibly suggestive as to give rise to
a very substantial likelihood of misidentification is a mixed question of law
and fact that does not turn on an evaluation of credibility and demeanor.[25]  Accordingly, we apply a de novo standard of
review.








To
determine the admissibility of an out-of-court identification, we ask,
considering the totality of the circumstances, (1) whether the identification
procedure was impermissibly suggestive and, if so, (2) whether the improperly
suggestive procedure created a very substantial likelihood of irreparable
misidentification.[26]  Suggestiveness may arise from the manner in
which an identification procedure is conducted.[27]  For example, we have previously noted that
although a one-man field show-up does not in and of itself violate due process,
from a practical perspective it does carry with it a degree of suggestiveness.[28]  On the other hand, it also allows the police
to quickly release a person who has been seized but is not the perpetrator.[29]  But the question we must ask here is not
whether a show-up procedure carried with it a degree of suggestiveness, it is
whether the show-up was impermissibly suggestive.  A defendant bears the burden of establishing
by clear and convincing evidence that the pretrial identification procedure was
impermissibly suggestive.[30]  If we find that it is, we then must decide
whether the impermissibly suggestive procedure led to a very substantial
likelihood of irreparable misidentification.[31]








Appellant
asserts that the field show-up in this case was impermissibly suggestive
because (1) Marcus identified only the suspects that were in handcuffs whereas
he did not identify the suspect that was not in handcuffs and (2) the police
pressured Marcus to positively identify a suspect making him feel that they would
not take Ano@ for
an answer.

Our
review of the record, however, shows that the identification procedure employed
by the police in this case was not impermissibly suggestive.  The police officer who presented Lehman
MintorCthe
suspect whom Marcus could not identify and whom the police subsequently
releasedCcould
not remember whether Lehman was in handcuffs during the show-up.  Marcus, on the other hand, testified that he
looked at a number of suspects that night and that they all were
handcuffed.  Further, our review of the
record does not support Appellant=s
contention that the police unduly pressured Marcus to positively identify
anyone or that they would not take Ano@ for
an answer.  In fact, Marcus specifically
testified that the police Aasked
me to see if I recognized BB if
I recognized this person as being one of the two,@ and
that he did not feel that they put any pressure on him to identify anyone.  Accordingly, we hold that the field show up
was not impermissibly suggestive. 
Because of our disposition of this issue, we need not address whether
the procedure led to a substantial likelihood of misidentification.  We overrule appellant=s
first issue.








V. 
Conclusion

Having
overruled both of Appellant=s
issues, we affirm the judgment.

 

PER
CURIAM

PANEL:  DAUPHINOT, MCCOY, and MEIER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  July 8, 2010











[1]See Tex. R. App. P. 47.4.





[2]Jackson v. Virginia, 443 U.S. 307, 319,
99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778 (Tex.
Crim. App. 2007).





[3]Steadman v. State, 280 S.W.3d 242, 246
(Tex. Crim. App. 2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006).





[4]Steadman, 280 S.W.3d at 246; Watson,
204 S.W.3d at 414B15, 417.





[5]Watson, 204 S.W.3d at 417.





[6]Johnson v. State, 23 S.W.3d 1, 9
(Tex. Crim. App. 2000); see Steadman, 280 S.W.3d at 246.





[7]Steadman, 280 S.W.3d at 247; see
Watson, 204 S.W.3d at 417.





[8]786 S.W.2d 271 (Tex.
Crim. App. 1989), cert. denied, 498 U.S. 881 (1990).





[9]701 S.W.2d 850 (Tex.
Crim. App. 1985).





[10]18 S.W.3d 277 (Tex.
App.CAustin 2000, pet. ref=d).





[11]784 S.W.2d 453 (Tex.
App.CTyler 1989, pet. ref=d).





[12]919 S.W.2d 107 (Tex.
Crim. App. 1996).





[13]1 Steven Goode et
al., Texas Practice: Guide to the Texas Rules of Evidence ' 103.2 (3d ed. 2002)
(citing Ford, 919 S.W.2d at 113).





[14]Ford, 919 S.W.2d at 113.





[15]Id.





[16]Id. at 113B14; see also George
v. State, 959 S.W.2d 378, 384 (Tex. App.CBeaumont 1998, pet. ref=d).





[17]See Ford, 919
S.W.2d at 113B14; George,
959 S.W.2d at 384.





[18]Resendez v. State, 306 S.W.3d 308, 312B13  (Tex. Crim. App. 2009) (quoting Lankston
v. State, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).





[19]Buchanan v. State, 207 S.W.3d 772, 775
(Tex. Crim. App. 2006).





[20]Heidelberg v. State, 144 S.W.3d 535, 538
(Tex. Crim. App. 2004); see also Layton v. State, 280 S.W.3d 235, 240
(Tex. Crim. App. 2009) (holding that error was preserved because A[a]fter receiving a
copy of DeLarue and hearing [a]ppellant=s argument, the trial
judge should have been aware of the basis of the objection@); Rivas v. State,
275 S.W.3d 880, 887 (Tex. Crim. App. 2009) (holding that an objection is not
defective merely because it does not identify a rule of evidence); Clarke v.
State, 270 S.W.3d 573, 580, 583 (Tex. Crim. App. 2008) (holding error
preserved when claim on appeal was same essential claim made to the trial
court, just Agussied . . . up with
legal authority@).





[21]See Lankston, 827 S.W.2d at 909.





[22]Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).





[23]Amador, 221 S.W.3d at 673; Estrada
v. State, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson v. State,
68 S.W.3d 644, 652B53 (Tex. Crim. App.
2002).





[24]Simmons v. United
States,
390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); Barley v. State, 906
S.W.2d 27, 32B33 (Tex. Crim. App.
1995), cert. denied, 516 U.S. 1176 (1996).





[25]Loserth v. State, 963 S.W.2d 770, 772B73 (Tex. Crim. App.
1998); Page v. State, 125 S.W.3d 640, 646 (Tex. App.CHouston [1st Dist.]
2003, pet. ref=d).





[26]Simmons, 390 U.S. at 384, 88
S.Ct. at 971; Barley, 906 S.W.2d at 33.





[27]Barley, 906 S.W.2d at 33.





[28]Stewart v. State, 198 S.W.3d 60, 63
(Tex. App.CFort Worth 2006, no
pet.).





[29]Id.





[30]Barley, 906 S.W.2d at 33B34.





[31]See id.; Delk v. State,
855 S.W.2d 700, 706 (Tex. Crim. App.), cert. denied, 510 U.S. 982
(1993).