# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00032-CR

**Jeffrey Sharp, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
### NO. 38147, HONORABLE GUILFORD L. JONES III, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Jeffrey Sharp guilty of delivery of between one and four grams of cocaine and assessed punishment at thirty-five years in prison. Sharp complains of the admission of evidence seized after an allegedly illegal stop of a vehicle, the denial of a requested jury charge regarding illegally obtained evidence, the denial of his request for discovery about a confidential informant witness's immigration case status, and the admission of evidence regarding his compliance with parole conditions. We will affirm the judgment.

## BACKGROUND

Sharp does not challenge the sufficiency of the evidence to support his conviction, and thus we need not set out the evidence in great detail. We will summarize the relevant evidence to provide context for the discussion of Sharp's points of error.

In the course of investigating a missing compressor and other tools, Blanco County Sheriff's Office Corporal Jimmy Fox contacted Sergio Trevino. Trevino denied having the compressor, but said that Sharp had the missing items. Trevino said he did not find them again when he went to Sharp's residence to confirm their presence. Trevino then reported that Sharp had illegal narcotics, triggering the investigation that underlies this case. Trevino became a confidential informant, making the connection between Sharp and the putative buyer, Department of Public Safety Agent Rickye Feist.

Agent Feist testified that Sharp offered over the telephone to sell him seven grams of cocaine for $300 on October 27, 2009. Feist met with Sharp and Trevino twice in the afternoon of October 28, 2009. Law enforcement gave Trevino money to make the purchase, and Trevino testified that he gave the money to Sharp, but Sharp did not supply the cocaine. Trevino testified that Sharp left him at a house in Granite Shoals while going to obtain the drugs, but Sharp did not come back. Feist testified that by 9:30 that evening, he believed that the deal was going awry, so peace officers went to find Sharp.

Burnet County Sheriff's Officer Tommy Headrick was driving a vehicle as part of that search. He testified that he recognized Sharp as the driver of an oncoming vehicle, although other officers riding in Headrick's vehicle testified that they could not see the driver of the vehicle. Headrick said that he stopped Sharp's vehicle because he knew from the investigation that Sharp did not have a valid driver's license. Officer Fox testified that, as the peace officer's vehicle approached, he saw furtive motions from the driver of Sharp's vehicle. Officers searched Sharp's vehicle on the roadside but did not recover the buy-money or any contraband. There was testimony that the truck was in disarray and that the officers' flashlight was weak and its batteries soon died. After Sharp's

2

vehicle was towed to a law-enforcement agency site, officers searched further and found in a speaker-well a baggie containing 2.2 grams of cocaine that was either crack cocaine or chunky powder cocaine. The officers also found other similar, empty baggies that they testified were of the type typically used for cocaine.

Sharp's version of events differed in important details. He said that Trevino—a friend of his best friend—asked him for help supplying Feist with cocaine. Sharp testified that Trevino said he was unable to find any cocaine and feared being hurt or killed by Feist for not getting the drugs. Sharp also said that Trevino had given Sharp's address to Feist, which scared Sharp given Feist's alleged attitude. Sharp said that he did not intend to supply Feist or Trevino with cocaine, did not know where to obtain cocaine, and denied receiving funds from Trevino. Sharp testified that he hoped to placate Feist long enough to give Trevino time to handle the situation. Sharp testified that Feist was intimidating and that Sharp's joking demeanor during their conversations was phony. Sharp denied putting cocaine into his vehicle, denied knowing that cocaine was in his vehicle, and stated that anyone could have placed cocaine into his vehicle while it was parked in front of his girlfriend's house. He admitted having committed three felonies previously, being on probation, and smoking marijuana once in the month prior to these events in violation of the conditions of his probation.

The jury found Sharp guilty of delivering cocaine through his offer to sell it to Feist.

## DISCUSSION

Sharp raises five points of error. He contends that the court should have suppressed evidence found in the search of his vehicle because it followed an illegal stop of his vehicle. He also

3

argues that the court should have instructed the jurors to disregard evidence that they believed was seized illegally. He contends that the trial court violated his right to confront witnesses by denying his motion to compel discovery of information about Trevino's immigration case and by denying his motion for continuance of the trial until that information was produced. Finally, he contends that the trial court erred by admitting evidence about his compliance with his parole terms.

**Points of error concerning the validity of the stop of Sharp's vehicle**

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). A trial court abuses its discretion when its ruling is arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). The trial court's ruling on the motion to suppress will be affirmed if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009). We apply a bifurcated standard of review. *Wilson v. State*, 311 S.W.3d 452, 457-58 (Tex. Crim. App. 2010). Although we defer almost totally to the trial court's determination of historical facts, we conduct a de novo review of the trial court's application of the law to those facts. *Id.* at 458. We defer almost totally to the trial court's application of the law to facts if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *see also State v. Johnston*, 336 S.W.3d 649, 657 (Tex. Crim. App. 2011).

Sharp contends that the peace officers did not know he was committing the offense of driving without a valid license when they stopped him. He does not contend that he had a valid license or that he was not driving the vehicle. He contends, however, that the peace officers could

not see into his vehicle at night and, therefore, could not have reasonable suspicion that he was driving the vehicle. Two peace officers—Fox and Burnet Police Officer Nolan Hicks—testified that they did not see the driver of the vehicle. They testified that both Sharp's vehicle and their vehicle were moving in opposite directions at regular traffic speed and that headlight glare on the windshield prevented them from seeing the driver. Fox asserted that another officer might have been able to see the driver. Headrick described the scene differently. He testified that the peace officers' vehicle and Sharp's stopped on opposite sides of a road at an intersection and that, when they passed each other driver's-side-to-driver's-side, he saw Sharp driving the vehicle. Because he knew that Sharp did not have a valid driver's license, Headrick stopped Sharp for violating the license requirement. *See* Tex. Code Crim. Proc. art. 14.04. The trial court apparently found Headrick credible and declined to suppress the evidence obtained in the subsequent search.

Under the standard of review, we cannot say that the trial court erred by finding officer Headrick credible. Knowing that Sharp lacked a valid driver's license, Headrick's identification of Sharp as the driver provided reasonable suspicion that a crime was being committed and justified that stop.[1] We overrule point of error one.

Sharp also contends that the trial court erred by failing to instruct the jury to disregard evidence if it believed the evidence was collected illegally or if it had reasonable doubts about the legality of the collection of that evidence. *See* Tex. Code Crim. Proc. art. 38.23; *Garza v. State*, 126 S.W.3d 79, 85 (Tex. Crim. App. 2004). He contends that a factual dispute regarding whether

---

[1] On appeal, Sharp does not challenge the validity of the ensuing search. Headrick testified that Sharp consented to the search, although Headrick insisted that he searched the vehicle based on his belief that the vehicle contained illegal drugs.

a peace officer could see into his vehicle and recognize him as the driver should have prompted that instruction because it called into question the legality of the seizure of the cocaine from his vehicle.

The defendant has a right to an instruction concerning disputed issues of fact material to his claim of constitutional or statutory violation that would render inadmissible the evidence obtained illegally if the following three requirements are met: (1) the evidence heard by the jury must raise an issue of fact, (2) the evidence on that fact must be affirmatively contested, and (3) the contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence. *See* Tex. Code Crim. Proc. art. 38.23; *Madden v. State*, 242 S.W.3d 504, 509-10 (Tex. Crim. App. 2007). The court of criminal appeals illustrated what sort of evidence would put a fact into question such that an article 38.23 instruction was required:

> Here, for example, one issue was whether appellant exceeded the speed limit of 55 m.p.h. through a construction site, giving Officer Lily a reasonable suspicion to stop him. If Officer Lily testifies that appellant did speed and Witness Two (or appellant) testifies that he did not speed, this disputed factual issue must be submitted to the jury. If the jury finds that appellant did obey the speed limit and that Officer Lily was unreasonable in believing that he did not, then they may not consider the evidence obtained as a result of this unlawful detention. If, however, Officer Lily says that appellant did speed, and Witness Two (or appellant) says that he doesn't remember or doesn't know, there is no disputed fact to submit because there is no affirmative evidence of a factual conflict. Similarly, if Officer Lily testifies that appellant did speed, but the cross-examiner grills him, "Isn't it true that he really did obey the speed limit, you're wrong or you're lying?" there is no factual dispute unless Officer Lily admits, "Yes, that is true." The cross-examiner cannot create a factual dispute for purposes of an Article 38.23(a) instruction merely by his questions. It is only the answers that are evidence and may create a dispute. Even the most vigorous cross-examination implying that Officer Lily is the Cretan Liar does not raise a disputed issue. There must be some affirmative evidence of "did not speed" in the record before there is a disputed fact issue.

*Madden*, 242 S.W.3d at 513-14 (citations omitted).

Sharp contends that the testimony regarding the officer's ability to identify him while driving the vehicle at night was disputed. Headrick said, "I actually could see Mr. Sharp driving it," and expressed no doubt that Sharp was the driver. On cross-examination he stated, "I believe I did [recognize Sharp]" despite the fact that he was paying "extra attention" to the street because of its narrowness, the headlights reflecting off the windshield, and the movement of his vehicle and Sharp's vehicle. Sharp contends that this testimony is contradicted by Headrick's passenger, Fox, who answered affirmatively when asked on cross-examination the following question: "And because of the speed, the darkness, the fact that the headlights reflect off of a windshield, wouldn't it be fair to say it would've been impossible to see the facial features of the driver of that oncoming vehicle?" On redirect examination, however, when asked about that affirmative response, Fox replied, "I didn't see the driver. I'm not saying that the other officers didn't. I couldn't see." Sharp revisited the issue on recross-examination in the following exchange:

Q. So, once again, when you said the conditions were impossible to be able to see someone in oncoming vehicles, you're correct about that, correct?

A. I can just tell you that I couldn't see—from where I was in the back seat, I couldn't see facial features or anything like that as the other vehicle passed.

Q. Even though you had a clear view out that front windshield as the car passed, correct?

A. Right. There was headlights on the other vehicle as well shining in our face as we passed.

Q. Which would've made it even that much more difficult for somebody in your vehicle to be able to see?

[Prosecutor]: Objection; speculation.

THE COURT: Sustained.

7

Q. [by defense counsel] But because of those headlights that were shining, it caused you to not be able to see into the vehicle that was oncoming, correct?

A. That was oncoming, yes.

Q. And that along, with the other conditions such as the reflection of the lights off of the windshield, didn't allow you to see into the oncoming car, correct?

A. The oncoming car, yes.

Headrick's other passenger, Hicks, agreed generally that driving at night "[m]akes it so that because of that reflection, you really can't see inside the windshield on a dark night without extra illumination." He testified that, despite sitting in the front seat of the police vehicle driven by Headrick, he did not see who was driving Sharp's vehicle, but added that he did not know Sharp so he was not really focused on seeing the driver.

Sharp has not shown a fact issue regarding Headrick's testimony that he recognized Sharp. It is clear that the other officers did not recognize Sharp, but none said that Headrick did not. Fox clarified that when he agreed that conditions made seeing another driver "impossible," he meant only for himself. He affirmatively refused to assert whether anyone else could have or did see Sharp. The evidence in this case is most like the second scenario discussed in the excerpt from *Madden* above in which the court of criminal appeals stated that "there is no disputed fact to submit because there is no affirmative evidence of a factual conflict." *Id.* at 513. The trial court, therefore, did not err by declining to give an instruction under article 38.23 in this case.

**Points of error related to information concerning Trevino's immigration status**

By point three, Sharp asserts that the trial court erred by denying his motion to compel discovery of Trevino's immigration case information so that Sharp could properly investigate and

8

confront Trevino. By point four, Sharp contends that the trial court erred by denying his motion for continuance in order to discover Trevino's immigration case information after Trevino testified that he was not in the process of being deported. He contends that these failures infringed on his constitutional right to confront Trevino. *See* U.S. Const. amend VI.

We review these related decisions for an abuse of discretion. *See Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996) (continuance); *Scaggs v. State*, 18 S.W.3d 277, 295 (Tex. App.—Austin 2000, pet. ref'd) (discovery). To establish that the trial court abused its discretion by denying the motion for continuance, a party must show specific prejudice to his defense such as an inability to effectively cross-examine the State's witnesses or to elicit crucial testimony from potential witnesses. *Janecka*, 937 S.W.2d at 468.

In a pretrial discussion, Sharp said he needed documents from Trevino's immigration case to explore his credibility and his motivation. Sharp said he wanted to know why a person with criminal convictions, aliases, and failures to appear for immigration hearings would be assigned a low appearance bond ($1,500), and whether a peace officer involved in this case had posted that bond. Sharp speculated that Trevino might be working as a confidential informant for the federal authorities and that Trevino might be motivated to lie to convict Sharp and please law enforcement. The trial court noted that Sharp already knew Trevino's criminal history, could question the peace officers about the bond, and had enough material to successfully and thoroughly impeach Trevino.

Trevino testified that he had two convictions for driving while intoxicated, an arrest for tampering with a government record that resulted in a non-felony plea for probation, a revocation of that probation, an arrest for forgery that was dismissed, arrests for driving with an invalid driver's license, a conviction for theft by check, and a pending charge for failure to pay child support. On

9

cross-examination, Sharp elicited an admission that Trevino had told law enforcement that he was born in the United States despite having been born in Mexico. Trevino denied having made that misstatement in order to avoid immigration consequences, but Sharp presented previous testimony by Trevino in which he conceded that he had misrepresented his birthplace in order to get bonded out before an immigration hold could be placed on him. Trevino then stated that he was not worried about deportation, that he was not going through deportation proceedings, and that he was going to become a citizen. He denied that he was in the country illegally—though, when confronted, he conceded that he had overstayed his visa, which was illegal. Sharp also confronted Trevino with inconsistencies in his application to become a confidential informant, revisited his criminal history and revoked probation, and cross-examined him on his actions in this case.

Sharp then requested a continuance and disclosure of Trevino's alien registration number so that he could obtain Trevino's immigration file. Sharp testified that these records (1) would establish that Trevino was being deported, not made a citizen; (2) would disclose whether Trevino was detained because of the testimony of a confidential informant; and (3) would disclose why Trevino was being detained by immigration enforcement. Sharp contended that this information bore on Trevino's credibility, which Sharp argued was critical to the State's case. Sharp argued that he would need a few days to obtain and study the information and then pursue any queries generated as a result.

The trial court opined that Sharp had impeached Trevino on several points and revealed his violation of his visa. The court stated that the information in the federal records would "be a very minimum additional aid in what you need it for," then denied the requests.

10

We conclude that the trial court did not abuse its discretion by denying the requests for discovery and continuance, and further conclude that Sharp has not shown that any error was harmful. Sharp effectively showed that Trevino had an opinion of his immigration status that was inconsistent with his expired visa and criminal history and raised questions regarding the implications of that discrepancy, including whether Trevino was getting help with citizenship in exchange for his cooperation with law enforcement. Even if the requested documents and time could have somehow more thoroughly impeached Trevino, however, the trial court's denial of those requests did not contribute to Sharp's conviction, which stands largely on Feist's testimony that Sharp offered to sell him cocaine. The jury found that Sharp "did knowingly deliver, by offering to sell, to Rickye Feist, a controlled substance, namely cocaine, in an amount more than one gram but less than four grams." *See* Tex. Health & Safety Code § 481.112. The legislature has defined the term "deliver" to include "offering to sell a controlled substance." *See id.* § 481.002(8). Proof of an offer to sell a controlled substance must be corroborated by a person other than the offeree or by evidence other than a statement of the offeree. *Id.* § 481.182; *see McDuff v. State*, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997) ("The test for sufficient corroboration is to eliminate from consideration the accomplice testimony and then examine the other inculpatory evidence to ascertain whether the remaining evidence tends to connect the defendant with the offense.") Feist testified that Sharp offered to sell him cocaine, and other testimony and evidence corroborates the offer. Sharp testified that he called Feist and "led him to believe that Sergio was trying, you know, and that maybe I would help him" supply Feist with cocaine. The jury heard audiotapes of conversations Sharp had with Trevino and Feist in which they generally discussed the transaction. Sharp also testified that he did not have cocaine, did not intend to buy or sell cocaine, and did not know where

11

he could buy it, but the jury was entitled to disregard that part of his testimony[2]—particularly in light of the cocaine found in Sharp's vehicle.

Because Sharp impeached Trevino on issues related to his immigration status without the immigration case documents he sought, and because the verdict stands without reference to Trevino's testimony, we conclude that any error by the trial court in denying Sharp's motions to compel discovery and for a continuance was harmless under either applicable standard. *See* Tex. R. App. P. 44.2(a) (beyond a reasonable doubt that the error did not contribute to the conviction or punishment); 44.2 (b) (error did not affect substantial rights).

**Point concerning the admission of evidence regarding Sharp's parole status**

By his fifth point of error, Sharp contends that the trial court erred by allowing improper impeachment and character evidence regarding his parole status. Sharp objected to the testimony under Texas Rules of Evidence 403, 404, and 609. The credibility of a witness may be attacked by evidence that the witness committed a felony if the court determines that the probative value of admitting the evidence outweighs its prejudicial effect to a party. Tex. R. Evid. 609. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. *Id.* R. 404(b). Evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *Id.* R. 403. We review a trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 390-91 (Tex. Crim. App. 1990).

---

[2] *See Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998).

Sharp contends that the admission of evidence regarding his use of marijuana while on parole concerned a collateral matter and allowed the jury to convict him based on the impression that he was a bad person generally. On direct examination by his attorney, Sharp admitted he had been convicted of the felonies of injury to a child, burglary of a building, and burglary of a habitation. On cross-examination, Sharp testified that he had been placed on parole after being released from prison. Over Sharp's objection, the State elicited testimony that he had not complied with the terms and conditions of his parole. He testified that he had reported to his parole officer when required and had passed all but one of twenty-seven drug tests. He admitted that he had smoked marijuana once while on parole, and his parole officer confirmed that he tested positive for marijuana. He denied using other illegal substances. Sharp's parole officer later testified that Sharp's positive test (and his admission of having smoked marijuana in the previous month) occurred on the morning of October 27, 2009—the same date as this offense occurred.

Sharp did not object to the initial question about whether he was on parole. He has waived error regarding evidence that he was on parole. *See* Tex. R. App. P. 33.1(a).

We find no error under Rule 609. Sharp admitted his three convictions on direct examination by his attorney, and those convictions are not excludable under Rule 609 because they are felonies. *See* Tex. R. Evid. 609.

Even if the court erred by admitting the evidence despite the objection under Rules 403 and 404(b), we conclude that Sharp was not harmed by its admission. The offense charged required only that he offer to sell cocaine and, aside from testimony from Feist and Trevino that Sharp made the offer, the jury heard Sharp testify that he agreed to help Trevino. Although Sharp maintained that he never intended to obtain or sell cocaine to Feist, the jury heard testimony

13

that cocaine was found in Sharp's vehicle albeit in an amount smaller than the proposed sale to Feist. In light of the other evidence, we conclude that any error in the admission of evidence that he smoked marijuana once sometime in the month before offering to sell cocaine did not affect his substantial rights or contribute to his conviction. *See* Tex. R. App. P. 44.2.

## CONCLUSION

Finding no reversible error, we affirm the judgment of conviction.

_____

Jeff Rose, Justice

Before Justices Puryear, Rose, and Goodwin

Affirmed

Filed:   April 16, 2014

Do Not Publish

14